UNITED STATES of America,
Plaintiff–Appellee,

v.

Timothy Vernell SCISUM,
Defendant–Appellant.

No. 93–4180.

United States Court of Appeals,
Tenth Circuit.

Aug. 23, 1994.

Robert H. Copier, Salt Lake City, UT, for defendant-appellant.

Wayne T. Dance, Asst. U.S. Atty. (Scott M. Matheson, Jr., U.S. Atty., Paul M. Warner, Asst. U.S. Atty. and Kevin L. Sundwall, Sp. Asst. U.S. Atty., on the brief), Salt Lake City, UT, for plaintiff-appellee.

Before TACHA, Circuit Judge and McKAY, Senior Circuit Judge and SHADUR, Senior District Judge.*

SHADUR, Senior District Judge.

Timothy Scisum ("Scisum") appeals his conviction on Count Three of a three-count indictment, on which the jury had initially found him not guilty on Count Two and then—after having sent word earlier that it was deadlocked on Counts One and Three—ultimately found him not guilty on Count One as well, but guilty on Count Three. Scisum claims two types of reversible error, stemming from:

1. the trial judge's ex parte meeting with an individual juror in chambers without apprising counsel of that meeting until the following day—the day after the verdict had been returned and the jury had been polled and then discharged; and

2. the trial judge's refusal to give jury instructions that had been tendered by Scisum's counsel.

We find the second contention to be without merit, but the first contention requires reversal and a new trial.

*Facts*

All three charges against Scisum arose out of an automobile trip that he took from the State of Washington to Utah with a pimp and two prostitutes, one of the latter being an adult and the other a minor (indeed, a 13-year-old):

1. Count One charged Scisum with having knowingly transported the adult prostitute in interstate commerce with the intention of having her engage in prostitution (a charge brought under 18 U.S.C. § 2421).

2. Count Two charged Scisum with having knowingly persuaded, induced, enticed and coerced the minor to travel in interstate commerce for the purpose of engaging in prostitution (a charge brought under 18 U.S.C. § 2422).

3. Count Three charged Scisum with having knowingly transported the minor in interstate commerce, intending that she engage in prostitution (a charge brought under 18 U.S.C. § 2423).

Each count also charged Scisum with having aided and abetted the described offenses in violation of 18 U.S.C. § 2.

After a two-day trial, including closing arguments and jury instructions, the jury retired to deliberate. After about four hours of deliberations the jury sent several notes to the court, including one stating that the jury had reached a verdict on Count Two but was unable to reach agreement on the other two counts:

---

* The Honorable Milton I. Shadur, Senior United States District Judge for the Northern District of Illinois, sitting by designation.

We are at an impasse on Counts One and Three. It does not look as if we'll come to any decision on these two counts.

After the trial judge responded in a manner that he had discussed with and had found was acceptable to both counsel, the jury resumed its deliberations and, later in the afternoon of the same day, sent word that it had reached a verdict. At that point the parties' counsel (who were not waiting in the courtroom) were notified to come to the courthouse for the return of the verdict.

Meanwhile one of the jurors approached the marshal in charge of the jury and asked whether she would have to be present in the courtroom when the verdict was announced.[1] Because the juror was visibly upset and crying, the marshal reported the matter to the judge as the latter was robed and ready to go into the courtroom to receive the verdict. At the marshal's suggestion the judge proceeded to meet with the juror—but he did so alone. Nothing was said to the lawyers about the matter, so they had no opportunity to provide any input as to what procedure ought to be followed. Instead the judge met with the juror while counsel were kept waiting, until they were told that the jury was being brought into the courtroom for the return of its verdict.

As we have already stated, the verdict on Count Three, the one that is now on appeal, found Scisum guilty. Each juror was then polled by the judge's clerk, and each—including the juror who had been visibly and audibly troubled by the prospect of joining in the other jurors' verdict in open court—confirmed that the verdict was the juror's own true verdict. At that point the judge thanked and discharged the jury, still having said nothing to counsel about his earlier conference with the individual juror. It was not until the next morning that the judge had counsel come into chambers, where he re-counted his own recollection of the events. We have attached the entire relevant portion of the transcript of that conference to this opinion, in order that none of the nuances of the encounter might be lost inadvertently through a summary description.

After having considered the judge's disclosure of the occurrence, Scisum's counsel filed a timely motion for a new trial, accompanied by this affidavit from the juror in question:

[A.C.], being first duly sworn, deposes and says as follows:

1. I served as Juror No. 2 in this case and met privately with the Judge and one of his clerks immediately prior to the time that the jury returned to the court room, announced the verdict, and was polled.

2. It is, and always has been, my view that the Defendant is not guilty of all three counts. But for my private meeting with the Judge and his clerk, I would have dissented from the guilty verdict when I was polled as to Count III of the indictment.

3. During my private meeting with the Judge referred to above, I told the Judge that I could not return to the court room and publicly state that I agreed with the verdict.

4. The Judge responded by indicating that he understood how I felt.

After that motion for a new trial was fully briefed, the trial judge denied the motion in a brief written opinion that, after quoting Fed. R.Evid. ("Rule") 606(b) and citing our opinion in *United States v. Greer*, 620 F.2d 1383, 1385 (10th Cir.1980), said in part:

Accordingly, the Affidavit of [A.C.] and the arguments made relative thereto regarding the effect the conference with the judge had on her decision to convict are inadmissible and inappropriate for the court's con-

---

1. Unfortunately the account that follows, which is drawn in principal part from the transcript that we have attached as an appendix, was not reflected in any formal evidentiary hearing, for none was held. Instead the transcript reflects an account of the conference that took place in the judge's chambers the following day, when the judge gave the lawyers his recollection of his encounter with the juror. We cite the transcript "App.Tr.—," with the citations referring to pagination in the original transcript (indicated by * numbers in the appendix).

sideration.[2]

And after stating his findings that the ex parte communication "was, at most, harmless error and would not have had a prejudicial effect on the decision-making process of the ordinary reasonable juror," the trial judge concluded his brief opinion by stating:

> The court is, of course, intimately familiar with the nature and content of the ex parte contact and concludes it would not have lead [sic] a typical juror to change his or her mind as to the merits of the case.

As for the jury instruction issues that Scisum has placed before us, he complains about the trial court's having failed to give several of the instructions that Scisum had tendered. Scisum argues that the instructions that were actually given rather than the instructions that his counsel had requested changed the outcome of the case. That argument is predicated in substantial part on the jury's original note, in which it stated that it was at an impasse, and the jury's later arrival at a verdict following its further deliberations. We will deal with the nature of the requested and the actual instructions during the course of our later substantive discussion of those issues.

### Ex Parte Communication

Fully four decades ago *Remmer v. United States*, 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954) (citing what is now a century-old decision, *Mattox v. United States*, 146 U.S. 140, 148–50, 13 S.Ct. 50, 52–53, 36 L.Ed. 917 (1892)) reconfirmed the principle that applies to every non-public non-record communication with a juror at any point in the course of a criminal case:

> In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.

And judges are not of course exempt from that proposition—indeed, Code of Judicial Conduct Canon 3 A(4) says that federal judges may "neither initiate nor consider *ex parte* or other communications on the merits or procedures affecting the merits of a pending or impending proceeding."

In light of the special sensitivity that attaches to this area from both perspectives, then, the most sensible reaction of any judge who is presented with any problem that appears likely to call for a communication with a juror is a Pavlovian response: Notify counsel for both parties promptly, both to identify the problem and to discuss the appropriate procedure to follow—almost invariably that calls for a meeting on the record with the juror, with all counsel present and participating. As *Remmer*, 347 U.S. at 229–30, 74 S.Ct. at 451–52, teaches even when a judge learns of a third party's contact with a juror:

> The trial court should not decide and take final action *ex parte* on information such as was received in this case, but should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate.

Accord, *United States v. McDonald*, 933 F.2d 1519, 1524–25 (10th Cir.1991).

We say that procedure should "almost invariably" be followed because there may of course be rare exceptions—a juror's sudden illness or other truly emergent situations come to mind. Even though in this instance it was no doubt the trial judge's commendable humanitarian instincts that led him to engage in a private encounter with a juror

---

**2.** As we discuss later, that ruling was certainly correct as to the second paragraph of the juror's affidavit. But if it was also intended to preclude any reference to or consideration of the rest of the affidavit, the judge was mistaken.

who had been reported to him as being very upset, this case serves as an object lesson in favor of the prophylactic approach that we again urge. We of course credit the judge's statement that he cautioned the juror that she should not talk to him about the deliberations or about the jury's decision (App.Tr. 5),[3] but the moment that the juror responded in the manner that she did, it should have been a conclusive signal to the judge to cut the conversation off and to bring counsel into the picture.

█ It is of course impossible for us actually to know what the result in this case would have been without the improper meeting. Rule 606(b) provides:

Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

That forbids our consideration of the second paragraph of the juror's affidavit, in which she says flatly that she would never have voted Scisum guilty on Count Three. We can and do however credit her Aff. ¶¶ 1, 3 and 4 as to what happened in the meeting

with the judge (an issue on which the judge's recollection was not as precise as,[4] but certainly did not controvert, the juror's Aff. ¶ 3). And it is certainly not amiss for us to recognize that what the juror says in her Aff. ¶ 2, although under Rule 606(b) we do not utilize that statement to impeach the verdict, identifies one of the major risks that prompts *Remmer*'s placement of a heavy burden on the government to prove harmless error.

In this instance the trial judge, having had the ex parte communication with the juror, then compounded the problem by not conducting a Rule 606(b) or *Remmer*-dictated hearing (see, e.g., *United States v. Armendariz*, 922 F.2d 602, 604–06 (10th Cir.1990)). We have in the past recognized the special problem that the rule against impeaching verdicts, as embodied in Rule 606(b), poses for determining whether such a communication was prejudicial or whether it rather created harmless error (*Mayhue v. St. Francis Hosp. of Wichita, Inc.*, 969 F.2d 919, 923 (10th Cir.1992)):

A trial judge will rarely be able to ascertain the actual prejudicial impact of a jury's exposure to external influences because a juror cannot testify regarding the subjective effect of such influences during a Rule 606(b) hearing.

But that problem is exacerbated immeasurably where the procedure employed by the trial judge is simply his after-the-fact recitation to counsel of his own recollection of an episode such as that involved here. Is counsel really in a position to cross-examine the judge, as would be possible with any other witness? And what of the total absence from the proceeding of the other party to the two-person conversation, the juror?[5]

That in a sense highlights a key point of our departure from the dissent by our re-

---

**3.** It is worth noting, however, that it was not the juror who had initiated the contact in the first instance. Instead the marshal confirmed (App. Tr. 4) that it had been his suggestion that the juror meet with the judge, who then accepted and acted on that suggestion (*id.* at 5).

**4.** What the judge said was this (App.Tr. 5):

She said that she would not want to go into the courtroom and face the Defendant and, as I remember, look at the Defendant. I'm not exactly sure as to the exact wordage.

**5.** Both examination and cross-examination of that nonwitness are of course unavailable to counsel as well.

spected colleague. It is of course a rhetorical overstatement—though it stems from the ultimate authority (*Rushen*, 464 U.S. at 118, 104 S.Ct. at 455)—to say that "[t]here is scarcely a lengthy trial in which one or more jurors do not have occasion to speak to the trial judge about something, whether it relates to a matter of personal comfort or to some aspect of the trial." Even if "lengthy trial" and "something" are given such broad meanings as to deprive that generalized statement of any real significance, the statement itself must be recognized as hyperbolic by any judge who spends his or her time laboring in the district court vineyards. But more importantly, situations in which any such ex parte contacts are meaningful or potentially meaningful are rare indeed. And when they do occur, the fact that they are between a juror and a judge and not between a juror and a third party makes all the more important the judge's sensitivity to the need for immediate advice to the parties and joint consideration of the appropriate course of conduct, rather than the judge proceeding on his own as he did in this case. We believe that the plain contrast between the situation described in, *McDonald*, 933 F.2d at 1523–25, and the situation in this case confirms the reason for our arriving at a different result here.

This is clearly not a case for the adoption of the same approach that we followed in, *United States v. Hornung*, 848 F.2d 1040, 1045–46 (10th Cir.1988), where we held that the *Remmer* presumption of prejudice was overcome by "the overwhelming evidence of defendant's guilt." No matter how reprehensible the charged conduct in this case, and whatever may .ultimately be held as to the merits of the case against Scisum, the fact is that the 12 jurors who were assigned to decide his fate the first time around plainly did not view the case as open and shut. Their first-arrived-at decision was to acquit Scisum of the other charge (Count Two) that involved the same minor as to whom he was charged with criminal conduct in Count Three. They reported themselves to the judge as hung on the other two counts

(Counts One and Three), then ultimately acquitted Scisum on one of them. And as for the critical juror, her statement to the judge that she could not return to the courtroom and announce publicly that she would vote for Scisum's conviction on that remaining count (Count Three) must be taken as an indication that had it not been for her intervening meeting with the judge, she would not have responded when the jury was polled that the guilty verdict on Count Three was her own true individual verdict.

█ We do not for a moment suggest that the judge knowingly pressured the juror into a different response—but we must always remember that any expression of a judicial viewpoint (or even a judge's intervention in the questioning of witnesses during trial) is likely to carry special weight with the persons whom we bring into the justice system on a one-time basis to serve as our jurors. Nor of course do we mean to suggest anything that would even approach the per se rule against a harmless-error conclusion that was rejected by the Supreme Court's per curiam opinion in *Rushen v. Spain*, 464 U.S. 114, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983). But neither *Rushen* nor any other authority teaches that we must be convinced beyond a reasonable doubt as to the effect of the ex parte communication in this case—it is enough for us to hold (as we do) that the United States has not met its heavy burden, as taught by *Remmer*, of showing harmless error.

### Jury Instructions

Because the case must be retried and because the trial judge will again have to formulate jury instructions, we turn to Scisum's complaints in that respect. They do not require much discussion, for the instructions that were chosen by the court below after the jury instruction conference were well within the discretion vested in a trial judge (*United States v. Troutman*, 814 F.2d 1428, 1451 (10th Cir.1987)). As a whole they surely provided the jury with an accurate statement of the applicable law (*United States v. Harmon*, 996 F.2d 256, 258 (10th Cir.1993)).

Here is the elements instruction on Count Three as given by the trial judge (Jury Instruction No. 35):

In order for the defendant to be found guilty of the charge in Count III, the government must prove each of the following elements beyond a reasonable doubt:

First, that the defendant, Timothy Vernell Scisum, transported J.N., a person under the age 18, from the State of Washington to the State of Utah;

Second, that the defendant did so with the intent that J.N. engage in prostitution; and

Third, that J.N. was under the age of 18 years at the time.

Scisum quarrels with the court's failure to give a different instruction, which stated the elements that the government had to prove beyond a reasonable doubt in this fashion (Scisum's Proposed Instruction No. 2):

One: The defendant, Timothy Scisum, knowingly transported [J.N.] from the State of Washington to the State of Utah;

Two: At the time of such transportation, one of defendant's main reasons for doing so was to encourage or force [J.N.] to engage in prostitution; and

Three: [J.N.] was under the age of 18 years at the time.

■ Counsel's stated objection to Jury Instruction No. 35 was to the asserted vagueness of the word "intent." But that word is of common enough usage to be clear to any reasonable lay juror. Moreover, any fleshing out that would arguably have been provided by Scisum's Proposed Instruction No. 2 (a doubtful proposition at best) was more than amply furnished by the trial court's giving of Jury Instruction No. 37 in addition to No. 35:

In order to sustain its burden of proof, the government must prove beyond a reasonable doubt that the defendant formed the intent to have the person engage in prostitution before the defendant transported or moved the person or caused the person to be transported or moved across state lines.

It is also not necessary for the government to prove that prostitution or other illegal sexual activity was the sole purpose for any transportation from one state to another. A person may have several different purposes or motives for such travel and each may prompt, in varying degrees, the act of making the journey.

The government need only prove beyond a reasonable doubt, that a significant or dominant purpose of the travel from one state to another was to have the person transported engage in prostitution or in any other illegal sexual activity.

■ Scisum's remaining objections, which relate to the trial judge's failure to include Scisum's other requested instructions in the package submitted to the jury, are a mixed bag. We need deal only briefly with those proposed instructions (assigning them the same numbers that Scisum's counsel attached to them in the trial court):

1. This was the elements instruction on Count One, on which Scisum was acquitted. Accordingly the issue is moot.

2. This elements instruction on Count Three has already been dealt with in our earlier discussion.

3. This proposed instruction would have required the government to "prove beyond a reasonable doubt that the defendant knowingly committed an unlawful act and purposely intended to violate the law." That specific-intent instruction misstates the legal standard under 18 U.S.C. § 2423, which is accurately set out in the already-discussed Jury Instructions Nos. 35 and 37.

4. This proposed instruction covered the presumption of innocence and the requirement of proof beyond a reasonable doubt. But Scisum has failed to specify how the instruction that was actually given (Jury Instruction No. 20), which accurately states the law in both of those respects, is deficient.

5 and 6. These were proposed cautionary instructions about the manner in which

the jury should consider the testimony of two codefendants who had agreed to plead guilty and to cooperate by testifying against Scisum in exchange for a recommendation of a more lenient sentence. Once again Scisum has failed to explain how his proposals provided a better or fairer statement of the relevant considerations in that respect than the instructions that were actually given to the jurors (Jury Instructions Nos. 43 and 44).

In sum, none of Scisum's disputes with the jury instructions establishes any error below. On the retrial that we have mandated, the trial court will not be required to give the instructions that Scisum tendered the first time around.

## Conclusion

Because the government has not borne its heavy burden of demonstrating that the trial judge's ex parte communication with a juror was harmless, we REVERSE Scisum's conviction on Count Three and REMAND for a new trial. In that trial Scisum's previously-submitted jury instructions need not be given to the jurors.

TACHA, Circuit Judge, dissenting.

I must respectfully dissent. I have no quarrel with the basic framework the majority uses to analyze the ex parte communication between judge and juror at issue in this case. I disagree, however, with the outcome under that framework.

Whether an ex parte communication with a juror has prejudiced a defendant is essentially a factual determination to be made by the trial judge. *Rushen v. Spain*, 464 U.S. 114, 119–20, 104 S.Ct. 453, 456–57, 78 L.Ed.2d 267 (1983). Normally, in making such a determination the trial judge should hold a full hearing. *See Remmer v. United States*, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954). "However, deviating from this preferred ap-

proach does not necessarily mean a trial is tainted by . . . error that warrants granting a mistrial." *United States v. McDonald*, 933 F.2d 1519, 1525 (10th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 270, 116 L.Ed.2d 222 (1991).

While the judge did not hold a full *Remmer* hearing in this case, he did gather counsel and other parties with knowledge of the ex parte contact in his chambers. He explained the nature of the contact and counsel had the opportunity to question him. Further, both parties had the opportunity to brief the issue in the context of defendant's motion for a new trial. The juror in question did not directly participate in any hearings, but she submitted an affidavit to the trial court. I also find it very significant that it was the trial judge himself involved in the ex parte communication.

It seems to me that there is a fundamental difference where an ex parte communication occurs between a juror and a trial judge as opposed to between a juror and a third party. If the trial judge himself is involved, the determination of prejudice will be that much easier for him to make, and the quantum of proof required of the government to meet its burden of showing that no prejudice occurred may be lessened. As the trial judge here said in denying defendant's motion for new trial: "The court is, of course, intimately familiar with the nature and content of the ex parte contact." We have no reason to presume that a trial judge will be anything other than diligent in making the determination of prejudice whether he was involved in the ex parte communication or not.

In this case the trial judge found that his contact with the juror involved only his helping to calm her down in a way that, in his judgment, did not prejudice the juror. Again, this is a determination to which we owe deference and there is nothing to indicate that something more problematic occurred.[1] The admissible portions of the ju-

---

1. We must defer to the trial judge's finding of fact regarding prejudice unless it "lack[s] even 'fair support' in the record." *Rushen*, 464 U.S.

at 120, 104 S.Ct. at 456 (alteration in original). We note that "[t]he absence of a contemporaneous recording [of the ex parte communication]

ror's affidavit, which was before the trial judge, do not contradict the judge's version of events and do not, in my opinion, raise questions of prejudice in light of the judge's comments on the matter. The juror said only: "During my private meeting with the judge referred to above, I told the Judge that I could not return to the court room and publicly state the verdict.... The Judge responded by indicating that he understood how I felt."

We cannot ignore that "[t]here is scarcely a lengthy trial in which one or more jurors do not have occasion to speak to the trial judge about something, whether it relates to a matter of personal comfort or to some aspect of the trial." *McDonald*, 933 F.2d at 1524. The fact that the following sounds redundant proves the point: The judge himself must to some extent be the judge of whether such ex parte contacts are prejudicial. Admittedly, the procedure followed by the trial judge in this case was not ideal. Nonetheless, deferring to the trial judge's determination as to prejudice, I would affirm the defendant's conviction.

*APPENDIX* (from Record Vol. IV[1])

[*3] THE COURT: Let's go on the record, Counsel. This is CR-93-159 that I'm going to refer to, United States of America versus Timothy Scisum.

And at the Court's request, I have asked you to come here so the Court may make a record of a matter that I feel is appropriate to have a record of. I've asked counsel, Mr. Paul Warner and Mr. Kevin Sundwall, Mr. Warner, Assistant United States Attorney, Mr. Sundwall, Special Assistant United States Attorney, who represented the United States in this case, and Mr. Robert Copier, who is counsel for Mr. Scisum, to be present.

And I've also asked Mr. Jim—is it James or Jim?

MR. PHELPS: I go by Jim.

THE COURT: James Phelps, the marshal in charge of the jury in that case, to be here and Ms. Lois Wallberg, who was my court clerk, to be present with the reporter.

I did call Alpha Reporting and asked if Ms. Sue Pearce could be here, since she was the reporter on the case, I just thought maybe for continuity, but she does work for Alpha Reporting. And we have Ms. Karen Murakami present with us, and they, of course, work very closely, so I don't see any problem in continuity here of the record.

The reason I wanted you here is to tell you of an [*4] incident that occurred after the jury announced that they had their verdict. I was in chambers robing up and getting ready to go on the bench when Mr. Phelps, the marshal, came in and advised that one of the jurors was very emotionally distraught out in the hall outside of the jury room, crying and—I don't remember if he said she wanted to talk to me or he thought it might be appropriate that I visit with her to find out, you know, what the emotional problem was.

Now, have I stated that accurately, Jim?

MR. PHELPS: That's right.

THE COURT: Do you remember—

MR. PHELPS: There was a second she didn't say anything, but she was very emotional. She was crying and I could tell—she had first asked if she could leave the building.

I told her she couldn't, she needed to stay here.

She said, "Do I have to go back into the courtroom?"

I said, "Yeah, you will."

And that's when she really started to cry. And I brought her to you, "I think you better go talk to the judge."

---

will rarely deprive the finding of 'even fai[r] suppor[t]' in the record." *Id.* (alteration in original).

1. Transcript pagination is indicated thus: "[*—]."

THE COURT: So then I think when Mr. Phelps talked to me about it, I said, "Well, you know, it's improper that I talk to her about the case."

[*5] But he advised me of her emotional distress.

And I said, "Well, maybe I should find out, you know, if there's something that I can do to see if she can become composed."

And so she sat here with me in chambers. She was very emotional. And I got some Kleenex for her and asked her to be calm. And, you know, I advised her that I must not have her relate to me anything about the deliberation, the verdict, what decision the jury has made.

She said that she would not want to go into the courtroom and face the Defendant and, as I remember, look at the Defendant. I'm not exactly sure as to the exact wordage.

And I said, "Well, it is necessary that the jury assemble and that we receive the verdict with the jury assembled."

And she said, as I recall, "Do I have to say anything or are they going to ask me anything?"

And I said, "There is the requirement that my clerk pole [sic] the jury and that—so that I'm satisfied that the verdict is unanimous."

And she was, again, very emotional.

I asked her if she would go into the rest room, I have a private rest room here in my chambers, and see if she could compose herself.

[*6] She wanted me to tell her what she should do.

And I said, "It's improper for me to tell you what you should do."

When she went into the rest room Ms. Wallberg was out in the clerk waiting area. I asked Ms. Wallberg, being a lady, if she would greet her when she came out of the rest room and see what she could do to calm her down, if she could become composed so she could go into the courtroom.

Ms. Wallberg did walk her down the hall. And I understood from Ms. Wallberg that she showed her her office and gave her an aspirin.

And about that time, I think that's when she came back, I heard—I had seen her at the doorway of my chamber area leading into the clerk's office, and she said, "I'm okay. I'm ready to go in."

And that was the extent of my contact with her. But I wanted you, Counsel, to know of her emotional distress and my contact with her in that regard.

And I don't know, Lois, have I accurately stated everything when I was with her?

THE CLERK: Yes.

I took her down—she needed to walk and she was sort of still teary-eyed, so I took her down the back corridor down by Judge Anderson's and took her into the clerk's office and showed her the area where I worked. And I [*7] asked her, I said, "Would you like an aspirin?"

She said, "Oh, I've got a headache."

So I gave her a Tylenol and some water.

And then we proceeded to come back out, but by then I gave her some Kleenex and she seemed to calm down.

I told her about my years of service with 27 years and that I had served on a jury with Aldon Anderson for six months and the jurors had been very friendly and get reunited. Almost every year they have their pictures taken together.

I never talked to her about the case at all. And then just to calm her down and that, to talk to her, but that's about it. I didn't say anything.

MR. WARNER: Can I clarify a point? As I understand it, this all occurred after the foreman had announced to Marshal Phelps that a verdict had been reached.

THE COURT: Right. The marshal came in, advised me they had reached a verdict.

I, then, called Lois and instructed her to contact you attorneys.

And I was in the process of robing up. In fact, I think I had my robe on, as I remember it, and that's when Mr. Phelps came in and advised me that this juror—did I mention her name? It was [A.C.], Juror Number 2, and that she was in the hall very emotionally—appearing to be [*8] very emotionally upset and crying.

MR. WARNER: I understand also, again, for clarification, Your Honor, that pursuant to Rule 606, neither Mr. Phelps nor Ms. Wallberg nor yourself ever had any discussion with her respective to the deliberative process?

THE COURT: My concern, when Mr. Phelps came in I think I did say to Mr. Phelps—you know, he asked if something—that, you know, he thought I should be aware of the fact she was out in the hallway crying and emotionally upset and if there was something that he thought that I should do to see if, you know, what the problem was. He didn't know whether she was ill or whether she was—what the situation was.

And so I said, "Well, you know, I have some reluctance because I must not talk to her at all about the case, but certainly if there's something I can do to assist her, if there's some problem health-wise or otherwise I would be pleased to find out what that is."

But before I even let her talk to me, I said, "Now, you must not tell me anything about the deliberative process or the decision of the jury. This is something that I cannot talk to you about. But is there something that I can do to address what your problem is?"

And that's when she said she did not want to go into the courtroom, she did not want to face the Defendant. [*9] She was—just appeared to be—to be very traumatic.

I gave her a Kleenex and asked her if she would step into the rest room and see if she could compose herself.

MR. WARNER: Thank you.

THE COURT: And I thought it right, Counsel, that you should be aware of this.

MR. COPIER: Did she offer any explanation for why she did not want to return to the courtroom?

THE COURT: Not really, that the process had been very emotional for her. I don't know if she said that in those words, but it was very—it was just—it was obvious to me that it was—and, you know, I have, in other cases, experienced jurors weeping in the jury box when the verdict is taken. I know it is often emotional to them.