UNITED STATES of America,
Plaintiff–Appellant,

v.

Kerry Dean BENALLY, Defendant–
Appellee.

No. 08–4009.

United States Court of Appeals,
Tenth Circuit.

Nov. 12, 2008.

Trina A. Higgins, Assistant United States Attorney (Brett L. Tolman, United States Attorney; Diana Hagen, Assistant United States Attorney, with her on the briefs), District of UT, for Plaintiff–Appellant.

Scott Keith Wilson, Assistant Federal Public Defender (Steven B. Killpack, Federal Public Defender, with him on the brief), District of UT, for Defendant–Appellee.

Before KELLY, McCONNELL and TYMKOVICH, Circuit Judges.

McCONNELL, Circuit Judge.

On October 10, 2007, a jury convicted Kerry Dean Benally of forcibly assaulting a Bureau of Indian Affairs officer with a dangerous weapon, in violation of 18 U.S.C. § 111(b). The next day one of the jurors came forward with a charge that the jury deliberations had been tainted by racial bias and other inappropriate considerations. The district court held that Federal Rule of Evidence 606(b)'s general rule against jurors testifying about jury deliberations did not apply and that the evidence of juror misconduct was sufficient to warrant a new trial. We disagree. Rule 606(b)'s prohibition covers juror testimony of racial bias in jury deliberations of the kind alleged in Mr. Benally's trial, and the Sixth Amendment does not require an exception. The original conviction is reinstated.

## I. BACKGROUND

Mr. Benally, a member of the Ute Mountain Ute tribe, was charged with forcibly assaulting a Bureau of Indian Affairs officer with a dangerous weapon. Prior to trial, he submitted several voir dire questions aimed at uncovering potential bias against Native Americans. The judge asked two of those questions at voir dire: "Would the fact that the defendant is a Native American affect your evaluation of the case?" and "Have you ever had a negative experience with any individuals of Native American descent? And, if so, would that experience affect your evaluation of the facts of this case?" No juror answered affirmatively to either question. The case proceeded to trial and the jury found Mr. Benally guilty.

The day after the jury announced its verdict, one juror approached defense counsel with unsettling information. This juror—"Juror K.C."—claimed that the jury deliberation had been improperly influenced by racist claims about Native Americans. The foreman, according to Juror K.C., told the other jurors that he used to live on or near an Indian Reservation, that "[w]hen Indians get alcohol, they all get drunk," and that when they get drunk, they get violent. Juror K.C. said that when she then argued with the foreman that not all Native Americans get drunk, the foreman insisted, "Yes, they do." Juror K.C. claimed that at that point a second juror chimed in to say that she had also lived on or near a reservation. While

Juror K.C. could not hear the rest of this juror's statement, it was "clear she was agreeing with the foreman's statement about Indians." Juror K.C. continued to argue with the foreman, going back and forth several times.

She also told defense counsel about another discussion in which some jurors discussed the need to "send a message back to the reservation." During this second discussion, Juror. K.C. says that one juror told how he had two family members in law enforcement and had "heard stories from them about what happens when people mess with police officers and get away with it."

Juror K.C. signed an affidavit attesting to both of these discussions. A defense investigator then contacted another juror who seems to have corroborated some of Juror K.C.'s claims, but this second juror was unwilling to sign an affidavit. The defense investigator did, however, sign an affidavit saying that the second juror "indicated that the jury foreman made a statement regarding Indians and drinking" and "said something like he had seen a lot of Indians that drink."

The investigator also testified that the juror recalled a statement about "sending a message back to the reservation."

Armed with these two affidavits, Mr. Benally moved to vacate the verdict and receive a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. He argued that the jurors had lied about their racial bias on voir dire and had improperly considered information not in evidence. The government opposed the motion on the ground that Mr. Benally's only evidence of misconduct was inadmissible under Rule 606(b). That rule states, in relevant part:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith.

FED.R.EVID. 606(b). Rule 606(b) provides three limited exceptions to this general prohibition against jurors testifying about jury deliberations:

> But a juror may testify about (1) whether extraneous prejudicial information was improperly brought to the jury's attention, (2) whether any outside influence was improperly brought to bear upon any juror, or (3) whether there was a mistake in entering the verdict onto the verdict form.

*Id.*

The district court admitted the juror testimony under the exceptions that allow jurors to testify about "whether extraneous prejudicial information was improperly brought to the jury's attention" or "whether any outside influence was improperly brought to bear upon any juror." Dist. Ct.Op. 2. Relying upon this evidence, the judge found that two jurors had lied on voir dire when they failed to reveal their past experiences with Native Americans and their preconception that all Native Americans get drunk and then violent. He also found that the jury had improperly considered extrinsic evidence when the juror whose family was in law enforcement related stories that showed the need to send a message. The judge viewed each of these as sufficient evidence of misconduct and granted a new trial. The government then appealed.

## II. ANALYSIS

"When the affidavit of a juror, as to the misconduct of himself or the other members of the jury, is made the basis of

a motion for a new trial, the court must choose between redressing the injury of the private litigant and inflicting the public injury which would result if jurors were permitted to testify as to what happened in the jury room." *McDonald v. Pless,* 238 U.S. 264, 267, 35 S.Ct. 783, 59 L.Ed. 1300 (1915). This case illustrates the tension between those interests. A juror has offered testimony that the verdict may have been influenced by improper arguments predicated on racial stereotyping and a need to send a message; but Mr. Benally can obtain redress (in the form of a new trial) only if that juror's testimony is admissible. Rule 606(b) says it is not.

## A. The History and Purpose of Rule 606(b)

The rule against impeachment of a jury verdict by juror testimony as to internal deliberations may be traced back to "Mansfield's Rule," originating in the 1785 case of *Vaise v. Delaval,* 99 Eng. Rep. 944 (K.B.1785). Faced with juror testimony that the jury had reached its verdict by drawing lots, Lord Mansfield established a blanket ban on jurors testifying against their own verdict. The rule was adopted by most American jurisdictions and "[b]y the beginning of [the twentieth] century, if not earlier, the near-universal and firmly established common-law rule in the United States flatly prohibited the admission of juror testimony to impeach a jury verdict." *Tanner v. United States,* 483 U.S. 107, 117, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987). This common-law principle, together with exceptions also developed by common law, was eventually codified into Federal Rule of Evidence 606(b).

Rule 606(b) is a rule of evidence, but its role in the criminal justice process is substantive: it insulates the deliberations of the jury from subsequent second-guessing by the judiciary. Jury decision-making is designed to be a black box: the inputs (evidence and argument) are carefully reg-ulated by law and the output (the verdict) is publicly announced, but the inner workings and deliberation of the jury are deliberately insulated from subsequent review. Judges instruct the jury as to the law, but have no way of knowing whether the jurors follow those instructions. Judges and lawyers speak to the jury about how to evaluate the evidence, but cannot tell how the jurors decide among conflicting testimony or facts. Juries are told to put aside their prejudices and preconceptions, but no one knows whether they do so. Juries provide no reasons, only verdicts.

To treat the jury as a black box may seem to offend the search for perfect justice. The rule makes it difficult and in some cases impossible to ensure that jury verdicts are based on evidence and law rather than bias or caprice. But our legal system is grounded on the conviction, borne out by experience, that decisions by ordinary citizens are likely, over time and in the great majority of cases, to approximate justice more closely than more transparently law-bound decisions by professional jurists. Indeed, it might even be that the jury's ability to be *irrational,* as when it refuses to apply a law against a defendant who has in fact violated it, is one of its strengths. *See* John D. Jackson, *Making Juries Accountable,* 50 Am. J. Comp. L. 477, 515 (2002).

If what went on in the jury room were judicially reviewable for reasonableness or fairness, trials would no longer truly be by jury, as the Constitution commands. Final authority would be exercised by whomever is empowered to decide whether the jury's decision was reasonable enough, or based on proper considerations. Judicial review of internal jury deliberations would have the result that "every jury verdict would either become the court's verdict or would be permitted to stand only by the court's leave." *Carson v. Polley,* 689 F.2d 562, 581 (5th Cir.1982).

Defendants undoubtedly have a powerful interest in ensuring that the jury carefully and impartially considers the evidence. This case presents that interest to the highest degree. But there are compelling interests for prohibiting testimony about what goes on in the jury room after a verdict has been rendered. The rule protects the finality of verdicts. It protects jurors from harassment by counsel seeking to nullify a verdict. It reduces the incentive for jury tampering. It promotes free and frank jury discussions that would be chilled if threatened by the prospect of later being called to the stand. Finally, it preserves the "community's trust in a system that relies on the decisions of laypeople [that] would all be undermined by a barrage of postverdict scrutiny." *Tanner,* 483 U.S. at 121, 107 S.Ct. 2739; *see also Resolution Trust Corp. v. Stone,* 998 F.2d 1534, 1548 (10th Cir.1993) ("[T]he rule against jurors impeaching their own verdict is designed to promote the jury's freedom of deliberation, the stability and finality of verdicts, and the protection of jurors against annoyance and embarrassment."); *Gov't of the V.I. v. Gereau,* 523 F.2d 140, 148 (3d Cir.1975) (listing these five policies behind the rule).

Like other rules of evidence protecting the confidentiality of certain communications, such as the attorney-client privilege or the priest-penitent privilege, Rule 606(b) denies the court access to what may be relevant information—information that might, for example, justify a motion for a new trial. But like these other privileges, the rule protects the deliberative process in a broader sense. It is essential that jurors express themselves candidly and vigorously as they discuss the evidence presented in court. The prospect that their words could be subjected to

judicial critique and public cross examination would surely give jurors pause before they speak. *See Tanner,* 483 U.S. at 120, 107 S.Ct. 2739 ("If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation—to the destruction of all frankness and freedom of discussion and conference.") (*quoting McDonald v. Pless,* 238 U.S. at 267–68, 35 S.Ct. 783). Moreover, part of the urgency that comes from knowing that their decision is the final word may be lost if jurors know that their reasoning is subject to judicial oversight and correction. Had she known that the judge would review the jury's reasoning process, for instance, Juror K.C. might not have argued so persistently with the foreman; she might have chosen instead to sit back and wait for the judge to correct the foreman's unreasonableness.

## B. Applicability of Rule 606(b) to the Juror Testimony in this Case

Against this background, we must consider whether Juror K.C.'s testimony, or the defense investigator's report of conversations with another juror, is inadmissible under Rule 606(b). The Rule provides: "Upon inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations," with certain exceptions. The Rule goes on to say that "[a] juror's affidavit or evidence of any statement by the juror may not be received on a matter about which the juror would be precluded from testifying." Thus, if Juror K.C. or the other juror questioned by the defense investigator could not have testified on these matters, it was error for the district court to receive either an affidavit or other evidence of the testimony.[1]

---

1. Even apart from Rule 606(b), the defense investigator's affidavit is likely inadmissible as

hearsay. *See W. Spring Serv. Co. v. Andrew,* 229 F.2d 413, 419 (10th Cir.1956) (finding

Juror K.C.'s testimony (along with the affidavit of the investigator reporting the statements of another juror) reported statements made by the jury foreman and other jurors in the jury room as part of the jury's discussion of the case. This evidence unquestionably falls within the category of testimony as to a "statement occurring during the course of the jury's deliberations." Mr. Benally does not argue otherwise.

He does argue, however, that the testimony concerning racial bias falls outside the ambit of the Rule because it is not being offered in connection with an "inquiry into the validity of a verdict or indictment." Fed.R.Evid. 606(b); *see Mc-Donald*, 238 U.S. at 269, 35 S.Ct. 783 ("the principle is limited to those instances in which a private party seeks to use a juror as a witness to impeach the verdict"). The testimony was offered, he argues, only to show that a juror failed to answer questions honestly during voir dire. The jurors had been asked whether they had any negative experiences with Native Americans and whether the fact that Mr. Benally is a Native American would affect their evaluation of the case. All jurors answered "no." Yet the challenged testimony suggests that two jurors allowed preconceptions about Native Americans to color their evaluation.

We cannot accept this argument. Although the immediate purpose of introducing the testimony may have been to show that the two jurors failed to answer honestly during voir dire, the sole point of this showing was to support a motion to vacate the verdict, and for a new trial. That is a challenge to the validity of the verdict.

■ It is true that juror testimony can be used to show dishonesty during voir dire, for purposes of contempt proceedings against the dishonest juror. *See Clark v. United States*, 289 U.S. 1, 12–14, 53 S.Ct. 465, 77 L.Ed. 993 (1933). Thus, if the purpose of the post-verdict proceeding were to charge the jury foreman or the other juror with contempt of court, Rule 606(b) would not apply. *McDonald*, 238 U.S. at 269, 35 S.Ct. 783. However, it does not follow that juror testimony that shows a failure to answer honestly during voir dire can be used to overturn the verdict.

There is a split in the Circuits on this point. The Ninth Circuit has held that "[s]tatements which tend to show deceit during voir dire are not barred by [Rule 606(b)]," even when the improper voir dire is the basis of a motion for a new trial. *Hard v. Burlington No. R.R.*, 812 F.2d 482, 485 (9th Cir.1987); *United States v. Henley*, 238 F.3d 1111, 1121 (9th Cir.2001) ("Where, as here, a juror has been asked direct questions about racial bias during voir dire, and has sworn that racial bias would play no part in his deliberations, evidence of that juror's alleged racial bias is indisputably admissible for the purpose of determining whether the juror's responses were truthful."). At least one district court, in addition to the court below, has adopted a similar interpretation of the Rule. *See Tobias v. Smith*, 468 F.Supp. 1287, 1290 (W.D.N.Y.1979) (citing evidentiary treatise that suggested "where comments indicate prejudice or preconceived notions of guilt, statements may be admissible not under F.R.E. 606(b) but because they may prove that a juror lied during the voir dire.").

The Third Circuit, by contrast, has held that such an interpretation would be "plainly too broad," and that Rule 606(b)

that counsel's affidavit relating what juror told him was "obviously hearsay and entitled

to no consideration").

"categorically bar[s] juror testimony 'as to any matter or statement occurring during the course of the jury's deliberations' even if the testimony is not offered to explore the jury's decision-making process in reaching the verdict." *Williams v. Price,* 343 F.3d 223, 235 (3d Cir.2003) (Alito, J.). Then–Judge Alito acknowledged that the Ninth Circuit had held otherwise in *Hard* but that "it appears that *[Hard]* is inconsistent with Federal Rule of Evidence 606(b)." *Id.* at 236, n. 5.

■ The Third Circuit's approach best comports with Rule 606(b), and we follow it here. Mr. Benally seeks to use Juror K.C.'s testimony to question the validity of the verdict. The fact that he does so by challenging the voir dire does not change that fact. *Cf. Capps v. Sullivan,* 921 F.2d 260, 263 (10th Cir.1990) (rejecting defendant's attempt to circumvent the rule by collaterally attacking the verdict with an ineffective assistance of counsel claim and asking what jurors would have thought had counsel requested a different jury instruction, noting that defendant "actually is probing their mental processes in their deliberations and using the results in an attempt to secure a new trial."). We agree with the government that allowing juror testimony through the backdoor of a voir dire challenge risks swallowing the rule. A broad question during voir dire could then justify the admission of any number of jury statements that would now be re-characterized as challenges to voir dire rather than challenges to the verdict. Given the importance that Rule 606(b) places on protecting jury deliberations from judi-cial review, we cannot read it to justify as large a loophole as Mr. Benally requests.

## C. Whether the Juror Testimony in this Case Falls Within One of the Enumerated Exceptions to the Rule

Since the contested juror testimony falls under Rule 606(b)'s general proscription, we must ask whether Mr. Benally can take advantage of one of the Rule's limited exceptions. Rule 606(b) enumerates three exceptions: "a juror may testify about (1) whether extraneous prejudicial information was improperly brought to the jury's attention, (2) whether any outside influence was improperly brought to bear upon any juror, or (3) whether there was a mistake in entering the verdict onto the verdict form." Fed.R.Evid. 606(b).

Mr. Benally argues that the juror statements in this case are about either "extraneous prejudicial information" or an "outside influence," falling under the first or second exception, respectively.[2] These exceptions for extraneous influences cover misconduct such as jurors reading news reports about the case, jurors communicating with third parties, bribes, and jury tampering. *See Tanner,* 483 U.S. at 117, 107 S.Ct. 2739 (citing cases that identified "extraneous influences"); *United States v. Davis,* 60 F.3d 1479, 1482–83 (10th Cir. 1995) (news reports as extraneous influence); *United States v. Scisum,* 32 F.3d 1479, 1483 (10th Cir.1994) (juror is permitted to testify that she had ex parte contact with judge but cannot testify about "mental processes in connection therewith");

2. Though Rule 606(b) treats these as separate exceptions, the parties, the district court, and many courts tend to conflate them in their analysis, as both concern whether the testimony is about "external" or "internal" matters. *See, e.g. Tanner,* 483 U.S. at 117–20, 107 S.Ct. 2739; 27 CHARLES ALAN WRIGHT & VICTOR JAMES GOLD, FEDERAL PRACTICE AND PROCEDURE: EVIDENCE 2D § 6075, 518 (2007) ("The courts have not fully clarified the meaning of these two terms, often treating them as interchangeable or even abandoning the language of the rule entirely in favor of the hybrid 'extraneous influence.' "). We therefore cite cases that would logically fall under the second exception even though the principal focus of Mr. Benally's challenge is on the first.

*Mayhue v. St. Francis Hosp. of Wichita, Inc.,* 969 F.2d 919, 921–22 (10th Cir.1992) (dictionary as extraneous influence); *United States v. Dempsey,* 830 F.2d 1084, 1092 (10th Cir.1987) (interpreter's misbehavior as extraneous influence); *Gereau,* 523 F.2d at 149 (listing situations that have been deemed "extraneous influences"). The exceptions do not extend to "discussions among jurors, intimidation or harassment of one juror by another, and other intra-jury influences on the verdict." *Gereau,* 523 F.2d at 150. They do not extend to evidence of drug and alcohol use during the deliberations. *Tanner,* 483 U.S. at 122, 107 S.Ct. 2739 ("However severe their effect and improper their use, drugs or alcohol voluntarily ingested by a juror seems no more an 'outside influence' than a virus, poorly prepared food, or a lack of sleep."). They *do not extend even to* questions of a juror's sanity. *See United States v. Dioguardi,* 492 F.2d 70 (2d Cir.1974) (denying inquiry into state of mind of juror who claimed during trial to be cursed and able to see the future, because state of mind is internal rather than external).

If a juror were to conduct his own investigation and bring the results into the jury room, as the Henry Fonda character does in *Twelve Angry Men,* that behavior would constitute extraneous information, and Rule 606(b) would allow another juror to expose it. *See Southern Pac. Co. v. Klinge,* 65 F.2d 85, 87 (10th Cir.1933) for a real-world example. Courts must be careful, however, not to confuse a juror who introduces outside evidence with a juror who brings his personal experiences to bear on the matter at hand. *See Marquez v. City of Albuquerque,* 399 F.3d 1216, 1223 (10th Cir.2005) ("A juror's personal experience, however, does not constitute 'extraneous prejudicial information.' "); 27 CHARLES ALAN WRIGHT & VICTOR JAMES GOLD, FEDERAL PRACTICE AND PROCEDURE: EVIDENCE 2D § 6074, 507 (2007) ("bias might not qualify as an 'outside influence' since it

is imposed as a factor in decision-making by the jury itself, not some source extrinsic to the jury."). We have said that "the inquiry is not whether the jurors 'became witnesses' in the sense that they discussed any matters not of record, but whether they discussed specific extra-record *facts* relating to the defendant, and if they did, whether there was a significant possibility that the defendant was prejudiced thereby." *Marquez,* 399 F.3d at 1223 (quoting *United States ex rel. Owen v. McMann,* 435 F.2d 813, 818 n. 5 (2d Cir.1970)). In *Marquez,* the juror's personal experience was quite specific and relevant to the matter at hand: she discussed her own experience training police dogs to help the jury determine the issue before it, which was whether the use of a police dog had constituted excessive force. *Id.* Nevertheless, we held that this was not extraneous prejudicial information under Rule 606(b). *Id.*

■ None of the statements that Mr. Benally alleges his jurors made are "specific extra-record facts relating to the defendant." They are generalized statements, ostensibly based upon the jurors' personal experience. The statements might have been relevant to the matter before the jury, but that is not the inquiry. *See Marquez,* 399 F.3d at 1223. We instead ask whether the statements concerned specific facts about Mr. Benally or the incident in which he was charged, and they did not. *Cf. United States v. Humphrey,* 208 F.3d 1190, 1199 (10th Cir.2000) (holding a juror's statement about the personal reputation of the defendant to be extraneous information outside the scope of the Rule). We do not deny that the jurors' alleged statements were entirely improper and inappropriate. The statements about Native Americans in particular were gross generalizations built upon prejudice and had no place in the jury room. Impropriety alone, however, does

not make a statement extraneous. That would unravel the internal/external distinction and make anything said in jury deliberations "extraneous information" so long as it was inappropriate. *See Martinez v. Food City, Inc.*, 658 F.2d 369, 373 (5th Cir.1981) ("[J]uror testimony regarding the possible subjective prejudices or improper motives of individual jurors has been held to be within the rule, rather than within the exceptions for 'extraneous influences.'"). *But see Tobias*, 468 F.Supp. at 1290 (conflating "improper" with "extraneous" by holding that "statements in the juror's affidavit are sufficient to raise a question as to whether the jury's verdict was discolored by improper influences and that they are not merely matters of jury deliberations."). It was an abuse of discretion for the district court to admit this testimony under Rule 606(b)'s exceptions.

### D. Whether this Court Should Imply An Exception to Rule 606(b) for Evidence Touching on Racial Bias

Mr. Benally then urges us that if the foreman's statements are not extraneous and do not fall under one of Rule 606(b)'s explicit exceptions, they should fall under an *implicit* exception for evidence of racial bias. The Ninth Circuit adopted this approach in *United States v. Henley*, when it said it would seem "consistent with the text of the rule, as well as with the broad goal of eliminating racial prejudice from the judicial system, to hold that evidence of racial bias is generally not subject to Rule 606(b)'s prohibitions against juror testimony." 238 F.3d at 1120. Racial bias, according to *Henley*, is so "plainly a mental bias that is unrelated to any specific issue that a juror in a criminal case may legitimately be called upon to determine" that any statement indicative of such bias cannot be deemed protected by an evidentiary rule. *Id.* Other courts have refused to read such an exception into the text of

Rule 606(b). *See, e.g., Shillcutt v. Gagnon*, 827 F.2d 1155 (7th Cir.1987) (applying Rule 606(b) to exclude a white juror's statement that "[The Defendant's] black and he sees a seventeen year old white girl—I know the type."); *Smith v. Brewer*, 444 F.Supp. 482 (S.D.Iowa 1978) (applying the Rule to exclude jurors' mimicking of black attorney during deliberations), *aff'd*, 577 F.2d 466 (8th Cir.1978).

To the extent the argument is made as a matter of policy, a court in a particular case is not the proper forum for making or enlarging exceptions to the rules of evidence. Our commission is to apply the Rules of Evidence as written and interpreted to the case at hand. Perhaps it would be a good idea to amend Rule 606(b) to allow testimony revealing racial bias in jury deliberations, but the body entrusted with making the Rules is Congress (advised by the Advisory Committee, which first considers proposed changes to the rules, takes public comment, and then recommends an appropriate action in a detailed report).

Congress deliberately rejected a version of Rule 606(b) with broader exceptions, which would have admitted the contested testimony in this case. The original House version of the rule would have allowed juror testimony regarding what was said in the jury room, while precluding testimony regarding the effect of those statements or anything else bearing on the subjective reasoning of the jurors. *See* H.R. 5463, 93d Cong., 2d Sess. (1974) ("Upon an inquiry into the validity of a verdict or indictment, a juror may not testify concerning the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith."). This would have adopted the so-called "Iowa Rule," in which jurors may

testify about "any matter occurring during the trial or in the jury room" as long as it "does not essentially inhere in the verdict itself." *Wright v. Illinois & Miss. Tel. Co.*, 20 Iowa 195, 210 (1866). The Senate rejected this "extension of the ability to impeach a verdict" as "unwarranted and ill-advised," S.Rep. No. 93–1277, 13 (1974), and its own version, which tracked the common-law rule, prevailed. *See Tanner*, 483 U.S. at 122–25, 107 S.Ct. 2739 (discussing the legislative history of Rule 606(b)). Notably, in the course of this discussion, one Senator referred to the problem of "bias" on the part of judges and juries, but noted: "I do not believe it would be possible to conduct trials, particularly criminal prosecutions, as we know them today, if every verdict were followed by a post-trial hearing into the conduct of the juror's deliberations." Letter from Senator McClellan to the Advisory Committee (August 12, 1971) 117 Cong. Rec. 33642, 33655 (1971).

■ The fact that Congress "specifically understood, considered, and rejected a version of Rule 606(b) that would have allowed jurors to testify on juror conduct during deliberations," *Tanner*, 483 U.S. at 125, 107 S.Ct. 2739, reinforces our conviction that courts must adhere to the terms of the Rule. Judicial implication of a broader exception would be inconsistent with congressional intent. Courts no longer have common law authority to fashion and refashion rules of evidence as the justice of the case seems to demand, but must enforce the rules as enacted.

### E. Whether Rule 606(b) Is Unconstitutional As Applied to Testimony that Would Support a Claim of a Sixth Amendment Violation

Mr. Benally's most powerful argument is that Rule 606(b) is unconstitutional as applied in this case, because it effectively precludes him from obtaining relief for what he regards as a violation of his Sixth Amendment right to an impartial jury. *See Tobias*, 468 F.Supp. at 1290 ("Whatever the scope of a jurisdiction's non-impeachment rule, a court determination of whether particular jury events are open or closed to inquiry must consider a defendant's sixth amendment rights to confront witnesses, to the assistance of counsel, and to an impartial jury.") (pre-dating *Tanner*); see also Wright & Gold, Federal Practice and Procedure: Evidence 2d § 6074, 513 (suggesting that although racially biased statements do not fall within the exceptions to the Rule, in some cases the Sixth Amendment may require their admission).

■ This Court, however, has consistently "upheld application of the Rule 606(b) standards of exclusion of juror testimony even in the face of Sixth Amendment fair jury arguments." *Braley v. Shillinger*, 902 F.2d 20, 22 (10th Cir.1990); *see, e.g., Johnson v. Hunter*, 144 F.2d 565 (10th Cir.1944) (Constitution did not require court to admit black juror's testimony that he was intimidated by other eleven white jurors, even though proof of that fact would require new trial and proof would be impossible without juror testimony). We continue to adhere to that view.

In its precedent most closely analogous to this case, the Supreme Court rejected the defendant's argument that his Sixth Amendment right to trial by a competent jury required the admission of evidence otherwise inadmissible under Rule 606(b). *Tanner*, 483 U.S. at 126–27, 107 S.Ct. 2739. In that case, after the jury had reached a guilty verdict, a juror voluntarily approached defense counsel and gave a sworn statement reporting heavy use of alcohol, marijuana, and cocaine by jurors during the trial. *Id.* at 115–16, 107 S.Ct. 2739. The Court "recognized that a defendant has a right to 'a tribunal both impar-

tial and mentally competent to afford a hearing,'" *id.* at 127, 107 S.Ct. 2739 (quoting *Jordan v. Massachusetts,* 225 U.S. 167, 176, 32 S.Ct. 651, 56 L.Ed. 1038 (1912)), and did not question that juror intoxication, if proven through admissible evidence, would implicate that Sixth Amendment right. The Court reasoned, however, that in light of the "long-recognized and very substantial concerns [that] support the protection of jury deliberations from intrusive inquiry," *id.,* and the availability of other "aspects of the trial process" that protect the defendant's "Sixth Amendment interests in an unimpaired jury," *id.,* the Sixth Amendment did not compel an exception to Rule 606(b), *id.*—even though, in the particular case, those other protections had failed to expose the problem, which therefore went uncorrected.

*Tanner* compels a similar result in this case. We must remember that the Sixth Amendment embodies a right to "a fair trial but not a perfect one, for there are no perfect trials." *McDonough Power Equipment, Inc. v. Greenwood,* 464 U.S. 548, 553, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984) (internal quotations omitted). Where the attempt to cure defects in the jury process—here, the possibility that racial bias played a role in the jury's deliberations—entails the sacrifice of structural features in the justice system that have important systemic benefits, it is not necessarily in the interest of overall justice to do so. As the Court said in *Tanner,* "There is little doubt that postverdict investigation into juror misconduct would in some instances lead to the invalidation of verdicts reached after irresponsible or improper juror behavior. It is not at all clear, however, that the jury system could survive such efforts to perfect it." *Tanner,* 483 U.S. at 120, 107 S.Ct. 2739.

The *Tanner* Court pointed out that there are a number of "aspects of the trial process," which, in most if not all cases,

serve to protect the defendant's Sixth Amendment right without breaching the ban on post-verdict juror testimony. *Id.* at 127, 107 S.Ct. 2739. The Court identified four such protections: voir dire, observation of the jury during court, reports by jurors of inappropriate behavior *before* they render a verdict, and post-verdict impeachment by evidence other than juror testimony. *Id.* Each protection might not be equally efficacious in every instance of jury misconduct. The judge will probably not be able to identify racist jurors based on trial conduct as easily as he could identify drunken jurors, for instance, and voir dire might be a feeble protection if a juror is determined to lie. This does not mean that defendants' interest in an impartial jury will go unprotected. Voir dire can still uncover racist predilections, especially when backed up by the threat of contempt or perjury prosecutions. Jurors can report to the judge during trial if racist remarks intrude on jury deliberations, enabling the judge to declare a mistrial or take other corrective measures. After the verdict is rendered, it could still be impeached if there is evidence of juror wrongdoing that does not depend on the testimony of fellow jurors in breach of Rule 606(b) confidentiality. And even trial observation could uncover racist attitudes if a juror openly wore his feelings on his sleeve. These protections might not be sufficient to eliminate every partial juror, just as in *Tanner* they proved insufficient to catch every intoxicated juror, but jury perfection is an untenable goal. The safeguards that the Court relied upon for exposing the drug and alcohol use amongst jurors in *Tanner* are also available to expose racial biases of the sort alleged in Mr. Benally's case.

The defendant attempts to distinguish *Tanner* on the ground that racial bias is a more serious and fundamental danger to the justice system than intoxicated jurors.

Perhaps that is so. But we do not see how the principle urged by the defendant in this case—that Rule 606(b) is unconstitutional as applied in a case where it prevents rectification of a Sixth Amendment violation—could be confined to the context of racial prejudice. It may well be true that racial prejudice is an especially odious, and especially common, form of Sixth Amendment violation. But once it is held that the rules of evidence must be subordinated to the need to admit evidence of Sixth Amendment violations, we do not see how the courts could stop at the "most serious" such violations. Indeed, it is hard to see why, under this theory, *Tanner* should not have been decided the other way.

Nor does there seem to be a principled reason to limit the exception only to claims of bias, when other types of jury misconduct undermine a fair trial as well. If a jury does not follow the jury instructions, or ignores relevant evidence, or flips a coin, or falls asleep, then surely that defendant's right to a fair trial would be aggrieved, just as Mr. Benally's was. *Cf. United States v. Voigt,* 877 F.2d 1465, 1469 (10th Cir.1989) (Rule 606(b) bars testimony that juror misunderstood jury instructions). How could we deny that defendant a chance to use juror testimony to seek a new trial, simply because the jury misconduct did not involve racial prejudice? But if every claim that, if factually supported, would be sufficient to demand a new trial warrants an exception to Rule 606(b), there would be nothing left of the Rule, and the great benefit of protecting jury decision-making from judicial review would be lost.

The defendant points out that no court of appeals has held, categorically, that Rule 606(b) is an absolute bar to the introduction of juror testimony regarding expressions of racial bias during jury deliberations. Other courts that have denied a

general exception for racial bias have at the same time acknowledged that "further review may be necessary in the *occasional* case in order to discover the *extremely rare* abuse that could exist even after the court has applied the rule and determined the evidence incompetent." *Shillcutt,* 827 F.2d at 1159 (emphasis added); *see also Smith,* 444 F.Supp. at 490 ("[T]he Court does not suggest that the rule of juror incompetency embodied in Rule 606(b) should be applied dogmatically and in complete disregard of what is alleged to have occurred in the jury room."). We are skeptical of this approach. If confidentiality can be breached whenever a court, after the fact, thinks the advantages of doing so are important enough, much of the damage has already been done. We are inclined to think that in such a case other remedies can be found, without violating Rule 606(b). But here, it suffices to say that the case has not been made. According to Juror K.C.'s account, racially biased statements were made but she herself countered them. The verdict was unanimous, which means that Juror K.C., who protested the racially prejudiced statements, joined in finding Mr. Benally guilty beyond a reasonable doubt. This is not a case, therefore, where the verdict itself was shown to be based on the defendant's race rather than on the evidence and the law.

We therefore reject the defendant's argument that Rule 606(b) contains an implicit exception for racially biased statements made during jury deliberations, nor do we think the Rule is unconstitutional as applied in this case.

## III. CONCLUSION

Because we hold that the district court erred in admitting both the juror testimony about racial bias and the juror testimony about sending a message under Rule 606(b), and because this was the only evi-

dence that Mr. Benally presented to challenge the verdict, we REVERSE the district court's motion granting a new trial and REINSTATE the jury verdict.