Gregory R. KITTLE, Appellant,

v.

UNITED STATES, Appellee.

No. 09–CF–1586.

District of Columbia Court of Appeals.

Argued Sept. 27, 2012.
Decided May 16, 2013.

Stephanie Schneider, Public Defender Service, with whom James Klein and Tammy Sun, Public Defender Service, were on the briefs, for appellant.

David Goodhand, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, Roy W. McLeese III, Assistant United States Attorney at the time the brief was filed, and John P. Mannarino and Stephen Prest, Assistant United States Attorneys, were on the brief, for appellee.

Before BLACKBURNE–RIGSBY and THOMPSON, Associate Judges, and STEADMAN, Senior Judge.

BLACKBURNE–RIGSBY, Associate Judge:

Following a jury trial, appellant Gregory Kittle was convicted of one count of assault and two counts of felony threats.[1] On appeal, appellant, who is African American, argues that the trial judge erred by refusing to conduct an inquiry in response to a juror's post-verdict allegation that several of her fellow jurors made racist remarks during deliberations.

This appeal presents issues of first impression for this court regarding the interpretation and scope of the "no-impeach-

---

1. In violation of D.C.Code § 22–404 (2007 supp.) and D.C.Code § 22–1810 (2001).

ment" rule articulated in *Sellars v. United States*, 401 A.2d 974 (D.C.1979), which provides that jurors may not challenge a verdict on the basis of matters that "inhere in the verdict itself." [2] In particular, appellant challenges the trial judge's response to the juror's allegation on two alternate grounds: (1) appellant argues that juror testimony regarding racist statements made by fellow jurors is not precluded by the no-impeachment rule because racial bias is an extraneous, not an internal, influence on the verdict; and (2) even if juror testimony regarding racial bias is inadmissible under the no-impeachment rule, the court must recognize an exception thereto because the trial court's failure to investigate the juror's allegations deprived appellant of his constitutional rights to trial by an impartial jury and due process.

We conclude that while the juror's allegation that some of her fellow jurors expressed racial bias during deliberations is a matter that "inheres in the verdict," it nevertheless implicates the fundamental importance of protecting the right to trial by an impartial jury. Therefore, under such circumstances, the trial judge does have discretion to inquire into a juror's post-verdict allegation of racial or ethnic bias expressed during deliberations and to determine whether there is a substantial likelihood that such comments made a difference in the outcome of the trial. However, given the particular circumstances of this case, the trial judge did not err in exercising her discretion by declining to hold a hearing to address the juror's post-verdict allegation of juror bias.

Appellant also alleges that the trial court's refusal to give the jury a self-defense instruction with respect to his assault charge was reversible error; we disagree. Finally, appellant argues and the government concedes that his two felony threat convictions merge; we agree and remand the case to the trial court to vacate one of appellant's felony threat convictions.

## I. Alleged Juror Misconduct

### A. Facts

Following a multi-day trial before Judge Ann O'Regan Keary, the jury found appellant guilty of assaulting Gilbert Davis and of two counts of felony threats.[3] On June 23, 2009, the same day that the court discharged the jury, Juror 237, an African American woman, wrote a letter to the judge. Four of the letter's five paragraphs discussed why the juror enjoyed serving on the jury and expressed her appreciation for the trial judge's decision to exclude the jurors from the next jury summons cycle. In particular, the juror "love[d] the fact that the jurors were allowed to talk to the attorneys in the case and express their views on how the case was presented." However, the fourth paragraph stated, in its entirety:

> I strongly feel that this case should not have taken as long as it did with the deliberations but some of us were faced with dealing with some jurors feeling

**2.** In our recent decision in *Fortune v. United States*, we acknowledged that "[t]he words 'inhere in the verdict' have a somewhat archaic quality to them, and it may not be immediately clear to modern ears what the common law phraseology connotes." *Fortune v. United States*, 63 A.3d 75, (D.C. 2013).

**3.** The jury acquitted appellant of destruction of property, first-degree burglary, and assault of Jonathan Frost with intent to commit rob-

bery. The judge declared a mistrial with respect to the remaining charges for which the jury failed to reach a verdict: (1) assault of Jerome Allison with intent to commit robbery; (2) assault of Jonathan Frost with intent to kill while armed; (3) felony assault of Jonathan Frost; (4) assault of Jerome Allison with intent to kill while armed; and (5) two counts of possession of a firearm during a crime of violence.

that all "blacks" are guilty regardless. With feelings like those, I don't think people like that should be allowed to serve on jury duty. I would seriously hope that our society is way above entertaining that thought.

The court provided copies of this letter to both counsel during a status hearing a few weeks later and admonished them not to conduct an independent investigation.

In response to the letter, appellant filed a motion for the trial court to grant a mistrial, or in the alternative, allow an investigation and hold an evidentiary hearing in response to Juror 237's allegation that several fellow jurors felt that "all 'blacks' are guilty regardless." The judge denied both requests on the record, emphasizing that as established by *Sellars v. United States*, 401 A.2d 974 (D.C.1979), post-verdict challenges by jurors are generally not permitted. Implicitly recognizing that she had discretion to investigate the juror's allegation if necessary, the trial judge observed that "I make my ruling in this regard in part analyzing the very letter itself on its face, which prompts me to find no need to further interview or question Juror 237 or any other juror. There is nothing in this letter which actually impugns the verdict itself." In particular, the judge found that the letter did not indicate that the juror harbored any doubts about the verdict itself, nor did the letter urge the court to reconsider the verdict. The trial judge also noted that after reviewing the notes sent to the court by jurors before they reached a verdict, she found no other comments that gave reason for concern. The trial judge further commented that during the lengthy *voir dire* used to select the jury, the parties struck all jurors who showed any signs of bias. Finally, the trial judge agreed with the government that the jury's decision to acquit appellant of some counts and its inability to reach a verdict on the most

serious counts rebutted any inference that racial bias influenced the verdict. Appellant filed a timely appeal of his convictions.

## B. Discussion

 Appellant's argument that the trial judge erred by refusing to investigate Juror 237's allegation that her fellow jurors harbored racial bias warrants a mixed standard of review. The issue of whether the juror's testimony regarding statements made by her fellow jurors during deliberations is precluded by the no-impeachment rule is a matter of law, which we review *de novo*. *See United States v. Villar*, 586 F.3d 76, 82 (1st Cir.2009) (applying *de novo* review to determine whether no-impeachment rule afforded the trial judge discretion to inquire into allegation of juror misconduct). We also consider *de novo* the corollary legal issue of whether the Constitution mandates an exception to the no-impeachment rule for allegations of racial or ethnic bias. *Id.* at 84. If we conclude that there is an exception to the no-impeachment rule, we accord trial judges "wide latitude with respect to the extent of the inquiry to be made" in cases addressing allegations of juror misconduct. *Wilson v. United States*, 663 A.2d 558, 562 (D.C.1995) (citation and internal quotation marks omitted). Accordingly, we review the trial judge's decision to deny appellant's motion for a mistrial without conducting an evidentiary hearing for abuse of discretion. *Id.* at 562.

### 1.

"Courts consistently have exercised great caution in allowing jurors to impeach their verdicts" for five significant reasons: "(1) discouraging harassment of jurors by losing parties eager to have the verdict set aside; (2) encouraging free and open discussion among jurors; (3) reducing incentives for jury tampering; (4) promoting

verdict finality; [and] (5) maintaining the viability of the jury as a judicial decision-making body." *Sellars, supra,* 401 A.2d at 981 (citations omitted). Since deciding *Sellars,* we have underscored the importance of the no-impeachment rule, observing that "[i]f evidence obtained from jurors could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation—to the destruction of all frankness and freedom of discussion and conference." *Boykins v. United States,* 702 A.2d 1242, 1248 (D.C.1997) (citation and brackets omitted).

The well settled no-impeachment rule articulated in *Sellars* provides that jurors may not challenge a verdict on the basis of "matters which essentially inhere in the verdict itself, as opposed to extraneous influences." 401 A.2d at 981 (citations and internal quotation marks omitted). "The Rule thus draws a dividing line between inquiry into the thought processes of the jurors on one hand, and inquiry into the existence of conditions or the occurrence of events calculated to exert an improper influence on the verdict, on the other." *Fortune, supra,* 63 A.3d at 83, 2013 WL 1831695, No. 09–CF–780 (D.C. May 2, 2013) (internal citation and quotation marks omitted). "Under this non-impeachment rule, even when information about the jury's decisional processes is volunteered by a juror, it is incompetent to impeach a final verdict on such matters as mistake of law, misapprehension of the testimony, and unsound reasoning by the jurors." *Boykins, supra,* 702 A.2d at 1247 (citations omitted). Thus, a "wide range of jury behavior ... provides no valid basis for impeachment based upon the jurors' own evidence." *Sellars, supra,* 401 A.2d at 981. An "extraneous influence" on the jury includes evidence that: (1) the jury learned of publicity unfavorable to the de-

fendant; (2) outside parties contacted a juror; (3) there had been a clerical error in reporting the verdict; or (4) the jurors obtained and considered evidence not admitted at trial. *Id.* (citations omitted).

In *Sellars,* the appellant requested relief from his manslaughter conviction upon learning that, after reaching their final verdict, some jurors admitted to the trial judge that they misunderstood a jury instruction. 401 A.2d at 977. Due to their confusion, the jurors had voted to convict the appellant despite their belief that he had acted in self-defense. *Id.* Yet, because we determined that a misunderstanding of the jury instructions was a matter that inhered in the verdict itself rather than an extraneous influence, we held that the jurors' testimony was inadmissible. *Id.* at 982. Here, we are called on to consider whether Juror 237's statement that some of her fellow jurors believed that "all blacks are guilty regardless" was evidence of an "extraneous influence" on the jury rather than a matter that "inheres in the verdict."

As noted above, the issue of whether the no-impeachment rule precludes the admission of post-verdict juror testimony regarding racial bias expressed by fellow jurors during deliberations is a matter of first impression for this court. Appellant argues that Juror 237's claim that some of her fellow jurors believed that "all 'blacks' are guilty regardless" was evidence of an improper extraneous influence, which fell within an exception to the no-impeachment rule. In particular, appellant relies on an excerpt from *Sellars* recognizing that an "exception appears to be developing, i.e., to allow juror impeachment if necessary for the exposure of violations of the accused's right to have the jury determine his guilt or innocence solely on the basis of the evidence adduced at trial." 401 A.2d

at 981. However, appellant neglects to address the court's clarification immediately thereafter, which provided: "a number of courts have allowed jurors to impeach their verdicts where they themselves have *obtained and considered evidence not admitted at trial.*" *Id.* at 981 (emphasis added). The expression of racial bias is not evidence that jurors could "obtain." Indeed, racial bias does not clearly fall within any of the four categories of "extraneous influences" described in *Sellars*—all of which relate to interference with a juror's decision-making process by an external source, such as a newspaper article about the case that has not been admitted into evidence or contact from a third party seeking to manipulate the verdict. *Id.* A fairly recent decision from the United States District Court for the District of Columbia highlighted the distinction between "extraneous influences" and "intra-jury influences":

> "Extraneous influence" has been construed to cover publicity received and discussed in the jury room, consideration by the jury of evidence not admitted in court, and communications or other contact between jurors and third persons, including contacts with the trial judge outside the presence of defendant and his counsel. By contrast, evidence of discussions among jurors, intimidation or harassment of one juror by another, and other intra-jury influences on the verdict is within the rule, rather than the exception, and is not competent to impeach a verdict.

*United States v. Wilkerson,* 656 F.Supp.2d 11, 15–16 (D.D.C.2009) (quoting *United States v. Wilson,* 175 U.S.App. D.C. 173, 176–77, 534 F.2d 375, 378–79 (1976)). Under this dichotomy, a juror's testimony that her fellow jurors expressed the sentiment that "all blacks are guilty regardless" is evidence of "discussion among jurors," which is an intra-jury influence. *Id.*

For guidance in applying the no-impeachment rule, we look to the Supreme Court's decision in *Tanner v. United States,* 483 U.S. 107, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987), and its progeny. Federal case law interpreting Federal Rule of Evidence 606(b) is applicable here because Rule 606(b) codifies the common law rule articulated in *Sellars* that renders juror testimony to impeach a verdict inadmissible.[4] *Tanner, supra,* 483 U.S. at 121, 107 S.Ct. 2739. This court has repeatedly relied upon *Tanner* to resolve allegations of juror misconduct.[5] In *Tanner,* the Su-

---

4. Rule 606(b), which addresses the juror's competency as a witness, provides:
 (1) During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.
 (2) Exceptions. A juror may testify about whether:
 (A) extraneous prejudicial information was improperly brought to the jury's attention;
 (B) an outside influence was improperly brought to bear on any juror; or
 (C) a mistake was made in entering the verdict on the verdict form.
 Fed.R.Evid. 606.

5. *See, e.g., Bellamy v. United States,* 810 A.2d 401, 409 (D.C.2002) ("Although a full-blown investigation into the matter might have allowed the judge to establish definitively whether the juror had lied about his employment, we have often warned trial judges to exercise great caution in allowing jurors to impeach their own verdicts." (citations omitted)); *Hawthorne v. Canavan,* 756 A.2d 397, 400 (D.C.2000) (citing *Tanner* to support holding that jurors may not impeach their own verdict); *Wilson v. United States,* 663 A.2d 558, 562 (D.C.1995).

preme Court considered whether the district court erred in concluding that a juror's testimony about the intoxication of fellow jurors was inadmissible under Federal Rule of Evidence 606(b). 483 U.S. at 121–22, 107 S.Ct. 2739. The petitioners filed a motion for a new trial because, after the trial was completed, two jurors informed petitioners that several members of the jury had consumed significant amounts of alcohol, cocaine, and marijuana throughout the trial. *Id.* at 115–116, 107 S.Ct. 2739. The Court concluded that Rule 606(b) proscribed the use of juror testimony about substance abuse by fellow jurors during trial to impeach the verdict because juror incompetence was an internal, not extraneous, influence on the deliberations.[6] *Id.* at 125, 107 S.Ct. 2739.

■ In a post-*Tanner* case directly on point, the Seventh Circuit found that the no-impeachment rule excluded evidence of jurors' racial bias because "[w]e cannot expunge from jury deliberations the subjective opinions of jurors, their attitudinal expositions, or their philosophies." *Shillcutt v. Gagnon*, 827 F.2d 1155, 1159 (7th Cir.1987) (citations omitted). The First, Fifth, and Tenth Circuits have also determined that the no-impeachment rule as embodied in Rule 606(b) "precludes any inquiry into the validity of the verdict based on juror testimony regarding racial or ethnic comments made 'during the course of deliberations.'" *Villar, supra,* 586 F.3d at 84; *Martinez v. Food City, Inc.,* 658 F.2d 369, 373–74 (5th Cir. Unit A Oct.1981); *United States v. Benally,* 546 F.3d 1230, 1237–38 (10th Cir.2008).[7] In light of our interpretation of *Sellars* and in accordance with the overwhelming majority of decisions from other jurisdictions that have already considered this issue, we conclude that a juror's testimony about racist statements made by fellow jurors is not evidence of an "extraneous influence" on the verdict. *See* 27 CHARLES ALAN WRIGHT AND VICTOR J. GOLD, FEDERAL PRACTICE AND PROCEDURE § 6074 at 505 (2d ed. 2007) ("On its face, Rule 606(b) clearly makes jurors incompetent to testify as to the effect of bias on the jury since such testimony would disclose jurors' mental or emotional processes. Most authorities would agree with this interpretation, holding that the rule precludes a juror from testifying ... that racial or ethnic prejudice played a role in deliberations." (footnotes omitted)).[8] Therefore, we hold that

---

6. In reaching this holding, the Court emphasized the importance of the no-impeachment rule: "There is little doubt that postverdict investigation into juror misconduct would in some instances lead to the invalidation of verdicts reached after irresponsible or improper juror behavior. It is not at all clear, however, that the jury system could survive such efforts to perfect it." *Tanner, supra,* 483 U.S. at 120, 107 S.Ct. 2739.

7. In addition, the Third Circuit reached the same conclusion in dicta. *See Williams v. Price,* 343 F.3d 223, 225–35 (3d Cir.2003) (Alito, J.) (addressing juror allegation that fellow jurors made racist remarks during the trial and emphasizing that *Tanner* "implies that the Constitution does not require the admission of evidence that falls within Rule 606(b)'s prohibition").

8. *But see United States v. Henley,* 238 F.3d 1111, 1120 (9th Cir.2001) (recognizing in dicta that ("a powerful case can be made that Rule 606(b) is wholly inapplicable to racial bias because ... '[a] juror may testify concerning any mental bias in matters *unrelated to the specific issues that the juror was called upon to decide....*'") (quoting *Rushen v. Spain,* 464 U.S. 114, 121 n. 5, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983) (per curiam) and adding emphasis)). We disagree with *Henley's* characterization of *Rushen* and note that the Supreme Court did not refer to *Rushen* when subsequently deciding *Tanner.* The "mental bias" at issue in *Rushen* was a juror's realization that a defense witness had murdered one of her childhood friends. 464 U.S. at 116, 104 S.Ct. 453. In allowing the juror to testify about this potential bias, the Court observed that "[a] juror may testify concerning any

the juror's testimony regarding racist statements made her fellow jurors is evidence of matters that "inhere in the verdict," and is thus inadmissible under the no-impeachment rule, unless, as we discuss below, a constitutional exception applies.

### 2.

However, our inquiry does not stop here; we must also consider whether the substantial, countervailing interest of protecting the right to an impartial jury that is untainted by racial or ethnic bias requires that we recognize a constitutional exception to this evidentiary rule. The exception would allow the trial judge to exercise her discretion to conduct a hearing if it appears necessary to ensure that a juror's racial or ethnic biases did not impair the defendant's constitutional rights. For the following reasons, we conclude that such an exception to the no-impeachment rule is warranted.

As an alternative to his argument that juror testimony regarding racial bias is not precluded by the no-impeachment rule, appellant argues that the application of the no-impeachment rule deprived him of his Fifth Amendment right to due process and his Sixth Amendment right to trial by an impartial jury. That is, he asserts, regardless of the no-impeachment rule's mandate, the trial court was obligated to inquire into Juror 237's allegations to ensure that appellant's constitutional rights were not jeopardized. In *Sellars*, the appellant did not raise the issue and we did not consider *sua sponte* whether the appellant's constitutional right to a fair trial was implicated when we held that jurors' testimony regarding their misunderstanding of the self-defense instruction was inadmissible. The government contends that the

Supreme Court has already considered and rejected these constitutional concerns in *Tanner*.

In *Tanner*, the petitioners argued that the trial court's refusal to consider testimony from jurors about their fellow jurors' intoxication during the trial violated "the sixth amendment's guarantee to a fair trial before an impartial and *competent* jury." 483 U.S. at 126, 107 S.Ct. 2739. In its decision, the Court noted that the trial court had already conducted an evidentiary hearing addressing potential juror intoxication and concluded that while juror testimony was inadmissible, the no-impeachment rule did not preclude testimony from nonjuror witnesses, such as Tanner's counsel, who testified that "he had observed one of the jurors 'in a sort of giggly mood.' " *Id.* at 113, 107 S.Ct. 2739. Essentially, the trial court had accepted that while juror intoxication could be a basis to challenge a verdict, it could not be proven by juror testimony. Framing the issue as whether "the Constitution compelled the District Court to hold an additional evidentiary hearing including one particular kind of evidence inadmissible under the Federal Rules," the Supreme Court reiterated that "long-recognized and very substantial concerns support the protection of jury deliberations from intrusive inquiry." *Id.* at 126–27, 107 S.Ct. 2739. Ultimately, the Court held that enforcement of the no-impeachment rule did not jeopardize the petitioners' constitutional rights, which are otherwise protected by several aspects of the trial process. *Id.* at 127, 107 S.Ct. 2739. In particular, potential jurors are vetted during *voir dire;* the jury is observable by the court, counsel, and court personnel during trial; jurors may "report inappropriate juror behavior to the court

mental bias in matters unrelated to the specific issues that the juror was called upon to decide and whether extraneous prejudicial information was improperly brought to the juror's attention." *Id.* at 121 n. 5, 104 S.Ct. 453 (citing Fed.R.Evid. 606(b)).

*before* they reach a verdict"; and, a party may still seek to impeach the verdict by "nonjuror evidence of misconduct." *Id.* (citations omitted).

Since *Tanner,* which dealt with the admissibility of juror testimony about juror competency, courts have grappled with its application to juror allegations of racial or ethnic bias expressed during deliberations. *See* discussion *infra* pp. 18–22. In particular, courts have considered whether the aforementioned aspects of the trial process that serve to protect a defendant against juror incompetence similarly operate to protect against the influence of racial bias on the defendant's right to a fair trial.

■ In determining whether *Tanner* forecloses appellant's constitutional argument, we first emphasize that " '[t]he right to trial by an impartial judge or jury is fundamental and deeply embedded in American jurisprudence.' " *Young v. United States,* 694 A.2d 891, 894 (D.C.1997) (quoting *Hughes v. United States,* 689 A.2d 1206, 1207 (D.C.1997)). "The Supreme Court has stressed repeatedly that the touchstone of the guarantee of an impartial jury is a protection against juror bias." *United States v. Boney,* 298 U.S.App.D.C. 149, 158, 977 F.2d 624, 633 (1992) (citing *McDonough Power Equip., Inc. v. Greenwood,* 464 U.S. 548, 554, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984)). Moreover, the Court has identified the exceptional threat posed by racial bias, observing that "[d]iscrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice."

*Rose v. Mitchell,* 443 U.S. 545, 555, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979). Accordingly, "[w]hen questions of juror bias are raised, the Supreme Court has long recognized that 'it would not be safe to lay down any inflexible rule because there might be instances in which such testimony of the juror could not be excluded without violating the plainest principles of justice.' " *Villar, supra,* 586 F.3d at 84 (quoting *McDonald v. Pless,* 238 U.S. 264, 268–69, 35 S.Ct. 783, 59 L.Ed. 1300 (1915)). Finally, the Constitution and federal and state laws unequivocally establish that state-sanctioned discrimination is unlawful and must be eradicated. *See, e.g.* U.S. CONST. amend. XIV, § 1 (the Equal Protection Clause); Civil Rights Act of 1964, Pub.L. 88–352, 78 Stat. 241 (prohibiting discrimination in application of voter registration requirements, public accommodations and employment, and eliminating racial segregation in public schools); and D.C. Human Rights Act, D.C.Code § 2–1402.01 *et seq.* (2001) ("Every individual shall have an equal opportunity to participate fully in the economic, cultural and intellectual life of the District and to have an equal opportunity to participate in all aspects of life....").

At present, the federal courts are split on the issue of whether, given the fundamental importance of an impartial jury to a fair trial, an allegation of racial or ethnic bias amongst jurors may necessitate an exception to the no-impeachment rule even though allegations of juror incompetence did not.[9] The analysis adopted by the

---

9. *Compare Villar, supra,* 586 F.3d at 85–87 (concluding trial court erred in finding that it lacked discretion to inquire into allegations of juror bias against Hispanic defendant), *Henley, supra,* 238 F.3d at 1120, *and Shillcutt, supra,* 827 F.2d at 1159, *with United States v. Benally,* 546 F.3d 1230, 1237 (10th Cir.2008) (concluding that trial court abused its discretion by admitting juror testimony regarding statements made by fellow jurors during deliberations, who despite denying that they had any bias against Native Americans during *voir dire,* argued that "when Indians get alcohol, they all get drunk," they are violent when they drink, and that the jury should send a "message back to the reservation"), *and Williams, supra,* 343 F.3d at 225–35.

First Circuit in *United States v. Villar* is particularly persuasive. In *Villar*, the defendant was a Hispanic man who was convicted of bank robbery by a jury. 586 F.3d at 78. A few hours after the jury delivered its verdict, defense counsel received an e-mail from one of the jurors stating that during deliberations, another juror said, " 'I guess we're profiling but they cause all the trouble.' " *Id.* at 78. The district court denied defense counsel's motion to inquire into the validity of the verdict, concluding that it had no discretion to act because an "allegation of ethnically biased statements within the jury room was not . . . an external matter open to post-verdict inquiry," and therefore, the no-impeachment rule "precluded the court from engaging in any further examination beyond the mere authentication of the e-mail." *Id.*

In its review of the district court's ruling, the First Circuit distinguished *Tanner* because it "did not address the issue of racial bias but instead involved issues of juror competence." *Id.* at 85. After surveying post-*Tanner* case law, the court concluded that, "[w]hile the issue is difficult and close," "the rule against juror impeachment cannot be applied so inflexibly as to bar juror testimony in those rare and grave cases where claims of racial or ethnic bias during jury deliberations implicate a defendant's right to due process and an impartial jury." *Id.* at 87. The court's rationale was that "the four protections relied on by the *Tanner* Court do not provide adequate safeguards in the context of racially and ethnically biased comments made during deliberations." *Id.* at 87. It explained:

> While individual pre-trial voir dire of the jurors can help to disclose prejudice, it has shortcomings because some jurors may be reluctant to admit racial bias. In addition, visual observations of the jury by counsel and the court during

trial are unlikely to identify jurors harboring racial or ethnic bias. Likewise, non-jurors are more likely to report inappropriate conduct—such as alcohol or drug use—among jurors than racial statements uttered during deliberations to which they are not privy.

*Id.* (footnote omitted). For those reasons, the First Circuit concluded that the district court did have "discretion to inquire into the validity of the verdict" by considering juror testimony "to determine whether ethnically biased statements were made during jury deliberations, and, if so, whether there is a substantial probability that any such comments made a difference in the outcome of the trial." *Id.* at 87 (observing that the experienced trial judge might have conducted an inquiry if he had possessed the discretion to do so). However, the court acknowledged the caveat that, for the sake of protecting the candid jury deliberation process, "not every stray or isolated off-base statement made at deliberations requires a hearing at which jury testimony is taken," rather, such testimony is only necessary in "rare and exceptional cases." *Id.* at 87–88; *see also Shillcutt, supra*, 827 F.2d at 1159 (holding that the no-impeachment rule "cannot be applied in such an unfair manner as to deny due process [and][t]hus, further review may be necessary to discover the extremely rare abuse that could exist . . . .").

Upon consideration of the Supreme Court's admonition in *Rose* that racial bias "is especially pernicious in the administration of justice," the concerns articulated in *Villar*, and the well-established laws regarding the illegality of state-sponsored discrimination, we conclude that the protections built into the trial process identified by *Tanner* do not adequately protect a defendant's constitutional right to a trial and jury free from racial or ethnic bias.

In addition to *Villar*'s discussion, *supra*, of the shortcomings of the *Tanner* protections in preventing the influence of jurors' racial or ethnic bias on a verdict, we note that jurors may choose to wait until after the verdict is delivered to report racial or ethnically offensive comments made by their fellow jurors for an array of reasons, such as an unwillingness to confront their peers or mere unawareness that the court may not consider their post-verdict testimony. Further, while asking jurors directly about potential biases during pretrial *voir dire* may eliminate some biased jurors, "many defense attorneys have sound tactical reasons for not proposing specific *voir dire* questions regarding racial or ethnic bias because it might be viewed as insulting to jurors or as raising an issue defense counsel does not want to highlight." *Villar*, *supra*, 586 F.3d at 87 n. 5. Finally, if we required trial courts to ignore all allegations that jurors expressed racial or ethnic bias during deliberations, we would jeopardize the public's confidence in the fair administration of justice. *State v. Santiago*, 245 Conn. 301, 715 A.2d 1, 19–20 (1998). The insidiousness of racial or ethnic bias is therefore distinguishable from other forms of juror misconduct or incompetence.[10] *See* 27 CHARLES ALAN WRIGHT AND VICTOR J. GOLD, FEDERAL PRACTICE AND PROCEDURE § 6074 at 513 (2d ed.2007) (citing *Rose*, *supra*, 443 U.S. at 554, 99 S.Ct. 2993) ("While lines may be difficult to draw in many cases, it should be clear that among the most serious cases of jury bias are those involving racial prejudice."). To hold otherwise would be to risk violating " 'the plainest principles of justice.' " *Villar*, *supra*, 586 F.3d at 84 (quoting *McDonald*, *supra*, 238 U.S. at 268–69, 35 S.Ct. 783).

■ Thus, we are unwilling to rigidly bind the discretion of trial judges to prevent further inquiry where it may be necessary to ensure that a defendant's constitutional rights to a fair and impartial trial and jury are not jeopardized by racial or ethnic bias. Accordingly, we hold that trial judges have the discretion to consider juror testimony in certain "rare and exceptional circumstances" where claims of racial or ethnic bias amongst jurors implicate

---

10. Several other state courts have recognized this distinction when addressing allegations of juror misconduct. *See, e.g., State v. Hunter*, 320 S.C. 85, 463 S.E.2d 314, 316 (1995) (finding that because allegations of racial prejudice "involve principles of fundamental fairness," trial judge properly considered juror's testimony about racial slur used by fellow juror); *State v. Santiago*, 245 Conn. 301, 715 A.2d 1, 19–20 (1998) (recognizing that "public confidence in the fair administration of justice is undermined if such allegations are not thoroughly investigated and quashed," and that "[a]llegations of racial bias on the part of a juror are fundamentally different from other types of juror misconduct"); *Fisher v. State*, 690 A.2d 917, 918 (Del.1996) (reversing conviction and remanding for new trial because juror's remarks were "improper injection of race as an issue into a criminal proceeding"); *Commonwealth v. Laguer*, 410 Mass. 89, 571 N.E.2d 371, 376 (1991) (recognizing that while "[j]uror bias is not an extraneous matter," "the possibility raised by the affidavit that the defendant did not receive a trial by an impartial jury, which was his fundamental right, cannot be ignored"); *Fleshner v. Pepose Vision Institute, P.C.*, 304 S.W.3d 81, 90 (Mo.2010) (en banc) ("The ethnicity or religion of any party or witness unrelated to the evidence should have no bearing on the outcome of a trial. To allow the verdict to stand without holding a hearing to determine whether the alleged [anti-Semitic] comments were made undermines public confidence in the justice system."); *State v. Hidanovic*, 747 N.W.2d 463, 474 (N.D.2008) (agreeing that "racial and ethnic bias cannot be condoned in any form and may deprive a criminal defendant of a right to a fair trial by an impartial jury," but finding that the trial judge did not abuse her discretion in denying Bosnian defendant's motion for a new trial based on an affidavit from a juror acknowledging that she made anti-Bosnian comments during deliberations).

the defendant's right to trial by an impartial jury. *Villar, supra,* 586 F.3d at 88. We limit the exception to rare and exceptional cases because we remain cognizant of the policy considerations that justify the no-impeachment rule—such as promoting verdict finality, encouraging frank discussions in the jury room, and discouraging post-verdict harassment of jurors—and urge trial judges to exercise caution when determining that juror testimony should be admitted for the purpose of investigating allegations that jurors harbored racial or ethnic bias.

### 3.

Having determined that the trial judge has discretion to admit juror testimony in rare and exceptional circumstances, where allegations of racial bias may have jeopardized a defendant's constitutionally-protected rights to an impartial jury, we conclude that the trial judge was not precluded from hearing juror testimony to investigate the allegation in Juror 237's letter. However, we still must consider whether the trial judge erred by denying appellant's request to inquire into the allegations raised by Juror 237's letter. As noted above, we review the trial court's decision to deny appellant's motion for a mistrial without conducting a hearing for abuse of discretion. *Wilson, supra,* 663 A.2d at 562. "In light of [the considerations articulated in *Tanner*], a judge surely does not abuse her discretion by refusing to hold an evidentiary hearing on … allegations which, even if true, would not warrant interference with the jury's verdict." *Id.* at 562; *accord Villar, supra,* 586 F.3d at 88 ("The determination of whether an inquiry is necessary to vindicate a criminally accused's constitutional due process and Sixth Amendment rights is best made by the trial judge, who is most familiar with the strength of the evidence and best able to determine

the probability of prejudice from an inappropriate racial or ethnic comment.").

Here, in response to Juror 237's allegation of racial bias, the trial judge weighed several considerations and essentially determined that this was not a rare and exceptional case that required a hearing. Although the trial judge concluded that the *Sellars* no-impeachment rule precluded inquiry into the allegations raised by the juror that inhered in the verdict, she did not restrict her ruling to this conclusion. *Cf. Johnson v. United States,* 398 A.2d 354, 363 (D.C.1979) (failing to recognize that trial court had discretion is, in itself, an abuse of discretion). Instead, the trial judge implicitly recognized that she had discretion to investigate the juror's allegation and question the juror, had she deemed it necessary. She observed that:

> [the letter] prompts me to find no need to further interview or question Juror 237 or any other juror. There is nothing in this letter which actually impugns the verdict itself. Unlike some of the case examples where we have situations where jurors have made actual statements that call into question whether or not the verdict was an appropriate one, nothing in this letter does that.

Thus, the trial judge neither expressed concerns about the fairness of the trial, nor indicated that but for the constraints of *Sellars,* she would have conducted a hearing.

 First and most importantly, the trial judge reasoned that, the verdict itself was nuanced; appellant was convicted of three counts, acquitted on three counts, and granted a mistrial on the remaining six counts, which were the most serious. If the verdict had been affected by racial bias, the trial court reasoned, it is arguably likely that appellant would have been convicted of all counts. Second, Ju-

ror 237's letter expressed frustration with *delays* in deliberations caused by her fellow jurors' racist sentiments, but did not call the verdict into question by suggesting that the verdict should be reconsidered. Third, during deliberations, the jury submitted thirteen notes to the judge—none of which indicated a concern with racial bias. Finally, when defense counsel and the prosecutor met with the jurors after the verdict to discuss the trial, none of the jurors mentioned to either counsel that racial prejudice affected the verdict.

For these reasons, we discern no error in the trial judge's conclusion that Juror 237's letter did not jeopardize appellant's constitutional right to an impartial jury. Nor do we conclude that the trial judge erred or abused her discretion by declining to hold a hearing and admit juror testimony. *See Wilson, supra,* 663 A.2d at 563 (holding that the trial judge did not abuse her discretion by declining to take testimony on juror misconduct because "[w]e discern no appreciable possibility" that the juror's alleged comments to other jurors "significantly affected the verdict"); *Shillcutt, supra,* 827 F.2d at 1160 ("[B]ecause we cannot say that there is a substantial likelihood that the alleged racial slur would have made a difference in the outcome of the trial, we conclude that applying the no-impeachment rule does not offend fundamental fairness."). Upon consideration of the particular circumstances of this case, we hold that the trial judge did not abuse her discretion in denying appellant's motion for a mistrial without holding a hearing to further investigate the allegations of racial bias made in Juror 237's letter.

## II. Self–Defense Jury Instruction

▮▮▮ We next consider whether the trial judge committed reversible error by denying defense counsel's request to give the jury a self-defense instruction with respect to his assault of Gilbert Davis, which arose from a bizarre chain of events that transpired at Davis's apartment. "Although the trial judge may properly refuse to give a defendant's requested instruction where no factual or legal basis for it exists, the failure to give such an instruction where some evidence supports it is reversible error." *Hernandez v. United States,* 853 A.2d 202, 205 (D.C.2004) (citation, internal quotation marks, brackets, and ellipsis omitted). "The test for some evidence is a minimal one: a defendant is entitled to a jury instruction on a theory of the case that negates his guilt if the instruction is supported by any evidence, however weak." *Id.* (citations, internal quotation marks, brackets, and ellipsis omitted). "In reviewing claims of instructional error, we view the evidence in the light most favorable to the defendant in order to ascertain whether there existed evidence sufficient for a reasonable jury to find in his favor." *Jones v. United States,* 999 A.2d 917, 922 (D.C.2010) (citations and internal quotation marks omitted).

### A. Facts

The chronology is somewhat convoluted. From the testimony of the government's witnesses, Jonathan Frost, Jerome Allison, and Gilbert Davis, we glean the following facts.[11] In the early morning hours of March 9, 2007, two friends, Jonathan Frost and Jerome Allison, went to an apartment building in Southeast, D.C. to visit their respective girlfriends. Frost's girlfriend was renting a room in Gilbert Davis's apartment and Allison's girlfriend lived in an apartment across the hall. While Alli-

11. Appellant did not testify. The only witness called by the defense was an investigator who visited one of the crime scenes.

son went to his girlfriend's apartment, Frost accompanied his girlfriend to a back room of Gilbert Davis's apartment. At that time, Davis was entertaining several people in the front area of his apartment.

According to Davis, appellant arrived at Davis's apartment and approached a woman named Meeka.[12] Appellant went to the back of the apartment and told Frost and his girlfriend to leave because he and Meeka needed the room. Appellant then returned to Davis. On his way out of the apartment, Frost walked through the living room and overheard appellant state to no one in particular: "Nobody leave" because he had "something to make everybody here jump."[13] Frost testified, without contradiction, that he believed this meant that appellant had a gun. Frost then proceeded across the hall and told Allison that he wanted to leave because he was concerned by appellant's behavior.

Meanwhile, appellant, who Davis thought seemed "anxious," put his arm around Davis, hugging him, while "negotiating about whether he could see [Meeka] or not." At that point, due to "some kind of vibe that [Davis] got" and his impression that something about appellant was "out of character," Davis grabbed appellant and held him for about fourteen minutes. During this period, Davis was lying on his back while holding appellant on top of him. Appellant attempted to get loose but Davis would not let him go. Davis testified that this made appellant "mad." Davis stated that he "never threatened" appellant during this period. Eventually, Meeka pried Davis's fingers off of appellant and according to Davis, once appellant was free, "he threw a few punches and kicked" Davis in the head. Davis testified that he did not block appellant's blows because they "were both exhausted."

Frost also observed appellant punch and kick Davis. He testified that he saw appellant hitting Davis, first with his fists and then with an ashtray, causing Davis's head to bleed. Frost then saw appellant leave the apartment, flipping over furniture on his way out, proclaiming: "Call the [expletive] cops and tell them I did it." Frost did not observe Davis threaten or strike appellant. Contrary to Frost's testimony, Davis denied that appellant struck him in the head with a glass object. Davis did, however, agree that after appellant struck him with his fists, appellant knocked over some items in the apartment and left the apartment. After leaving Davis's apartment, appellant forced his way into the apartment across the hall and provoked an altercation with Frost and Allison.

### B. Discussion

We view this "evidence in the light most favorable to appellant." *Jones, supra,* 999 A.2d at 922. To invoke self-defense, there must be some evidence that: "(1) [appellant] actually believed he was in imminent danger of bodily harm, and (2) he had reasonable grounds for that belief." *Guillard v. United States,* 596 A.2d 60, 63 (D.C.1991); Criminal Jury Instructions for the District of Columbia, No. 9.500 (5th ed. rev.2009). "Although it is most frequently the testimony of a defendant that will provide evidence of a defendant's reasonable fear of imminent serious bodily injury, it is possible to put a self-defense claim before the jury without a defendant's testimony." *Reid v. United States,* 581 A.2d 359, 367 (D.C.1990) (citations omitted). The instruction is unwarranted, however, if the

---

12. Davis testified that he and appellant had become friends by playing chess together and he believed that they remained friends at the time of trial.

13. Neither the government nor defense counsel questioned Davis about whether appellant made that statement.

evidence indicates that appellant "was the aggressor or if s/he provoked the conflict upon himself/herself." *Murphy–Bey v. United States*, 982 A.2d 682, 690 (D.C. 2009) (citation omitted).

■ Appellant argues that he was entitled to a self-defense instruction because he acted in response to Davis's "unprovoked, irrational attack," which was "made for no apparent reason" and that he reasonably believed that he would be attacked again after breaking free from Davis's prolonged restraint. Further, he claims that his actions were necessary to prevent a second "attack" from Davis, citing Davis's testimony that appellant "was really trying to get loose and I wouldn't let him loose." For several reasons, the evidence does not support appellant's characterization of Davis's actions, nor does appellant's characterization accurately reflect appellant's own role in triggering Davis's extended restraint. First, appellant neglects to consider Frost's testimony—which was not contradicted—that immediately before Davis restrained appellant, appellant had announced to the room that he had a gun. Second, Davis testified that he and appellant were friends, and that he restrained appellant in response to appellant's hug and his own perception that appellant seemed like he "was out of character." Such evidence suggests that appellant "provoked the conflict upon himself." *Murphy–Bey, supra*, 982 A.2d at 690. In addition, Davis's testimony indicated that he *held* appellant for fourteen minutes against appellant's will, not that he sought to *harm* appellant, and there was no evidence that appellant was actually harmed by the prolonged restraint. Moreover, Davis testified that his actions made appellant "mad," and no other witness testified otherwise. This indicates that appellant did not wish to be held by Davis, but does not establish that appellant was frightened or believed that he was in imminent harm. Instead, the evidence established that appellant punched and kicked Davis out of a sense of anger or frustration with Davis's conduct—not a belief that "he was in imminent danger of bodily harm," as required to invoke self-defense. *Guillard, supra*, 596 A.2d at 63.

The likelihood that appellant "actually believed he was in imminent danger of bodily harm" is belied by Davis's testimony that when Meeka pried his fingers loose, he was exhausted and for that reason, he did not even attempt to block appellant's blows. *Id.* It is very unlikely that Davis, who was lying on his back and was not shielding himself, posed an imminent threat to appellant's safety when appellant struck him. Further, appellant's actions immediately after striking Davis undermine the possibility that appellant acted in self-defense. Both Frost and Davis testified that appellant knocked over various household items and left the apartment, proclaiming: "call the [expletive] cops and tell them I did it." Appellant continued his rampage by forcing his way into the apartment across the hall. It does not follow that, if appellant felt as if he was in imminent danger of a second attack, he would further provoke Davis by knocking over his furniture, he would state that someone should inform the police that he "did it" or that he would remain in the vicinity.

In *Hernandez*, which appellant cites as analogous, we held that the defense theory that Hernandez stabbed the victim "while threatened with serious injury by a stronger man who pinned him to the ground with a hand around his neck was not so barren of evidentiary support that it could legitimately be kept from the jury." [14] 853 A.2d at 206. As in *Hernandez*, it was conceivable for appellant here to establish "some evidence, however weak" of self-defense

---

**14.** To support this theory, Hernandez called a witness who testified that, on the night of the

without testifying himself, through a witness such as Meeka or by eliciting testimony from Davis indicating that appellant was in pain or seemed frightened. Yet, unlike *Hernandez*, appellant introduced no evidence to support his theory and, as discussed above, the government's evidence, taken by itself, did not justify a self-defense instruction.

Here, there was no evidence, "however weak," to establish that appellant acted out of a fear of imminent harm. To the contrary, the evidence indicated that appellant announced to the room that he had a gun and that Davis restrained appellant for a prolonged period of time in response to a "weird vibe" he felt about appellant's anxious behavior. This restraint made appellant mad, and acting out of such anger, appellant struck Davis several times and knocked over various household items in Davis's apartment. Due to the lack of evidence establishing that appellant acted to defend himself from imminent harm, the self-defense instruction "would have invited the jury to engage in speculation and a

trial court is not required to instruct the jury on a defense theory that indulges or encourages speculation about events or beliefs not supported by testimony." *Bonilla v. United States*, 894 A.2d 412, 418 (D.C. 2006) (citation and internal quotation marks omitted). Accordingly, we hold that a reasonable juror could not have found, "without speculating," that appellant "actually believed that he was in imminent danger of bodily harm," and that "he had reasonable grounds for this belief." Therefore, the trial judge's decision to deny appellant's request for a self-defense instruction was not in error.

### III. Conclusion [15]

For the foregoing reasons, we remand this matter to the trial court to vacate one of appellant's felony threat convictions. We affirm in all other respects.

*So ordered.*

---

incident, Hernandez had returned home with his hair and back covered in leaves and with scratch marks on his throat that looked as if someone had choked him. *Hernandez, supra*, 853 A.2d at 205. An expert witness also testified that the victim was a chronic user of alcohol, which makes people combative, and that the victim's wounds were consistent with being stabbed from the ground up. *Id.* at 204. We recognized that the defense "might well have failed anyway as a practical matter without his own testimony describing the circumstances of the altercation (assuming there indeed was one); but that was not reason to deny him an instruction that had the required modicum of evidentiary support." *Id.* at 206.

15. Finally, appellant argues, and the government concedes, that his two convictions of felony threats should merge into a single offense. The felony threats convictions were supported by the following facts adduced at trial: when appellant left Davis's apartment, he came across the hall and pushed his way into the apartment across the hall. Frost and

Allison both testified that appellant entered the bedroom where Allison was and repeatedly demanded that Allison empty his pockets. Frost attempted to intervene to protect Allison, but appellant pushed Frost onto the bed, at which point Frost and appellant began to wrestle. Eventually, appellant got up to leave, but while doing so, he threatened to return and kill both Allison and Frost. According to Frost, appellant stated something along the lines of "I'm going to come back kill all you [expletive] in here." Allison similarly testified: "He said 'I'm going to kill all y'all when I come back.'" As appellant's threat to Allison and Frost was "one act directed at an undifferentiated group of victims," we agree that appellant's felony threat convictions merge and remand this matter to the trial court to vacate one of these convictions. *Cf. Hunter v. United States*, 980 A.2d 1158, 1163 (D.C.2009) ("Since these threats took place sequentially, as opposed to being one act directed at an undifferentiated group of victims, the convictions do not merge.").